STATE OF NEBRASKA, APPELLEE, V. CHARLES G. PETERSON, APPELLANT.

494 N.W.2d 551

Filed January 29, 1993.   No. S-91-507.

Emil M. Fabian, of Fabian & Thielen, for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

Hastings, C.J., Boslaugh, White, Caporale, Shanahan, Grant, and Fahrnbruch, JJ.

Grant, J.

After a jury trial, defendant, Charles G. Peterson, was convicted of attempted first degree murder, in violation of Neb. Rev. Stat. §§ 28-303(1) and 28-201(1), (2), and (3) (Reissue 1989), and of use of a firearm to commit a felony, in violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 1989). The victim was defendant's wife, Suzanne R. Peterson. Before trial, defendant's motion to suppress the evidence of results obtained from the testing of shoes discovered in defendant's vehicle was denied. Defendant was sentenced to consecutive terms of imprisonment of not less than 16²/₃ years nor more than 40 years for the attempted first degree murder conviction and not less than 6²/₃ years nor more than 15 years for the use of a firearm to commit a felony conviction.

Defendant timely appealed. In this court, he assigns three errors, contending that the trial court erred in (1) denying defendant's motion to suppress; (2) failing to grant defendant's motion to dismiss for the reason that the evidence was insufficient, as a matter of law, to support a conviction of attempted first degree murder; and (3) failing to grant defendant's motion to dismiss for the reason that the evidence was insufficient, as a matter of law, to support a conviction of use of a firearm to commit a felony. We affirm.

The record presents the following facts: Suzanne Peterson testified that on the morning of August 3, 1990, she was awakened by what she believed at the time to be an aneurysm or "a blood clot [that] had formed and exploded in her brain." At the time, she was recovering from an operation on her knee and was worried about blood clots forming and "was concerned something might be happening." She was in her upstairs bedroom at the time and immediately "sprang off" the bed and headed out the door. As she ran, she called out to defendant for assistance. She testified that she heard her husband respond to her and that she went toward him. She testified that she first

saw her husband after reaching the lower set of steps which would take her to the great room of the house. She asked her husband to call an ambulance because she had suffered an "explosion" in her brain. When she received no response to that request, she proceeded toward the kitchen where a telephone was located. As she proceeded in this direction, she felt another explosion. She was knocked down on her back. Once again she asked defendant to call an ambulance. She testified that although defendant phoned for an ambulance, he did not give the location of their home. She also asked defendant to call her parents. Defendant told her that he had attempted to, but that they were not home. Suzanne Peterson further testified that defendant then left the area and went upstairs. She next saw defendant at the front door before he walked past her to leave the house through the garage.

After she was alone, Suzanne Peterson attempted to call an ambulance herself, but discovered the phone was disconnected. She then dragged herself toward the sliding glass door and raised herself up with her left arm to unlock the door. Her cries for help were eventually heard by neighbors, and ultimately a police officer arrived and broke through the front door to assist her. After receiving emergency treatment at her home from the responding rescue squad, she was transported to the Offutt Air Force Base hospital, Ehrling Berquist. She was then told that she had been shot twice, once in the head and once in the back. She suffered permanent paralysis below the waist and permanent loss of vision in her right eye.

Defendant was arrested on the same day, August 3. He testified that he was at work the entire morning of August 3. He consented to a search of his vehicle, and during the search, a pair of black patent leather shoes was found in the trunk. On close examination, dark stains could be seen on the shoes. Later, these stains were determined to be bloodstains. Defendant was subsequently charged with attempted first degree murder and use of a firearm to commit a felony.

Defendant filed a motion for inspection, pursuant to Neb. Rev. Stat. § 29-1913 (Reissue 1989), and a more general discovery motion. The motions were granted, but defendant was later advised by the prosecution that there were no

remaining blood samples from the shoes for further testing, because the blood samples had been consumed in the State's testing. Defendant then filed a motion to suppress the evidence obtained from the State's testing.

At the hearing on the motion to suppress, Nebraska State Patrol crime lab forensic serologist Dr. Reena Roy testified that she was asked to test the shoes for blood. On August 10, 1990, she collected eight swabs of samples from the shoes, three from the left shoe and five from the right shoe. After removing those samples, it appears she then swabbed the shoes for additional samples, but did not find any more blood samples. Using the samples obtained from the shoes and following standard procedures, Dr. Roy proceeded to determine for each of the eight samples (1) whether blood was presumptively present (leucomalachite green test), (2) whether blood was conclusively present, (3) to what species the blood belonged (Ouchterlony test), (4) genetic markers (phosphoglucomutase, adenosine deaminase, adenylate kinase), and (5) blood type. On the left shoe, Dr. Roy was able to complete the first two tests and determine that the three samples were blood of some type, but she was unable to make any further tests due to insufficient samples of the material to be tested. Dr. Roy reached the same results for samples 4 and 5 on the right shoe. For samples 1, 2, and 3 on the right shoe, Dr. Roy completed enough tests to determine that all three samples were human blood, type A. Both defendant and the victim, as well as 40 percent of the Caucasian population, have type A blood. Further tests were not possible because there were no sufficient samples remaining. The trial court denied the motion to suppress.

In his first assignment of error, the defendant contends that the trial court erred in denying his motion to suppress all evidence of blood tests or analyses conducted by Dr. Roy on the shoes. When reviewing a trial court's determination on a motion to suppress, this court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Gibbs*, 238 Neb. 268, 470 N.W.2d 558 (1991). In proceedings where the statutes embodying the rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor

involved in assessing admissibility. *State v. Jacob, ante* p. 176, 494 N.W.2d 109 (1993); *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992).

Section 29-1913(2) excludes evidence of scientific tests or analyses when the prosecutor or his representatives make the evidence necessary for tests or analyses unavailable through their negligence or intentional acts. The issue here is whether Dr. Roy, as a representative of the prosecuting authority, was negligent in conducting every test for each sample, or whether she demonstrated bad faith by swabbing the entire shoe and thereby removing any remaining samples.

In regard to the charge of negligence, it cannot be said that the trial court abused its discretion in finding that Dr. Roy was not negligent in her testing. Dr. Roy testified that when she conducted the tests on the shoes, she followed the standard procedure of the office as well as scientifically accepted procedure. The first three samples from the left shoe tested positive for the presence of blood. Further tests of those samples were impossible because there were no sufficient remaining samples to test. From the five samples on the right shoe, she was able to determine that samples 1, 2, and 3 were human blood and to determine the blood type of the samples. For samples 4 and 5, Dr. Roy determined only that they were blood. Dr. Roy testified that samples used for testing could not be reused.

Standard procedure required running each of the eight samples through each of a series of tests to determine its composition, although determination of one sample had already been made. Dr. Roy testified that this procedure is followed because the determination of the composition of one sample does not prove the presence of the same substance in another area within the tested material. Dr. Roy did not make any assumptions as to any samples which she was unable to test based on the results of prior tests on the shoes. There were eight areas which had the suspect stain, and these were the areas she swabbed. The defendant does not appear to dispute that she followed the standard procedure for testing for blood. Certainly, defendant would have a valid objection if Dr. Roy had not followed those procedures and had simply presumed

the other samples were of the same substance.

Defendant first contends that "[l]aw enforcement officials acted in bad faith in violation of the Due Process clause of the Fourteenth Amendment to the Constitution of the United States, in failing to preserve potentially useful evidentiary material." (Emphasis omitted.) Brief for appellant at 11. We agree with defendant's statement that in *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), the U.S. Supreme Court held that the failure of law enforcement officials to preserve evidence potentially useful to a defendant is not a denial of due process of law unless a defendant can show bad faith on the part of law enforcement personnel.

In his brief, defendant conceded that "the State's failure to preserve one or more of the eight (8) spots of blood or the twenty-five (25) samples of blood obtained from those spots, probably does not, when taken alone, rise to the level of 'bad faith.' " Brief for appellant at 12. We agree. The evidence of Dr. Roy shows that the entire amount of the small samples in the eight spots of blood was consumed in the testing conducted by Dr. Roy. There was no bad faith in the conduct of any law enforcement agents in this regard.

Defendant contends that a different situation is presented in Dr. Roy's testimony that she "swabbed" both shoes in an effort to recover further samples. It is this action, apparently, that defendant categorizes as bad faith. We do not so find. The dispositive answer is that Dr. Roy discovered no further sample in this effort, and therefore, there was no remaining sample to test. There was nothing to preserve. Dr. Roy did not act in bad faith in this procedure.

Defendant then contends that, in any event, the conduct of the State violated § 29-1913. That statute provides:

(1) When in any felony prosecution . . . the evidence of the prosecuting authority consists of scientific tests or analyses of . . . blood . . . or other stains, upon motion of the defendant the court where the case is to be tried may order the prosecuting attorney to make available to the defense such evidence necessary to allow the defense to conduct like tests or analyses with its own experts. The

order shall specify the time, place, and manner of making such tests or analyses by the defense. Such an order shall not be entered if the tests or analyses by the defense cannot be made because of the natural deterioration of the evidence.

(2) If the evidence necessary to conduct the tests or analyses by the defense is unavailable because of the neglect or intentional alteration by representatives of the prosecuting authority, other than alterations necessary to conduct the initial tests, the tests or analyses by the prosecuting authority shall not be admitted into evidence.

Pursuant to this statute, defendant requested that the State produce, for defendant's analysis, "one pair of black patent leather shoes allegedly removed from Defendant's automobile trunk and any blood samples attached to or removed therefrom." This motion was granted by the court, but defendant was eventually advised by the State that the blood samples or specimens which had been removed from defendant's shoes no longer existed. Defendant then filed his motion to suppress, pursuant to § 29-1913(2), requesting that the trial court exclude from evidence "any and all blood tests or blood analysis conducted by the [State]." The trial court denied defendant's motion, and defendant now contends that that ruling was erroneous.

Defendant cites two cases concerning § 29-1913(2): *State v. Brodrick*, 190 Neb. 19, 205 N.W.2d 660 (1973), and *State v. Tanner*, 233 Neb. 893, 448 N.W.2d 586 (1989). *Brodrick* involved possession of a controlled substance. The evidence consisted of one tablet, which was tested by the State's chemist and then discarded. This court determined there was neglect on the part of the representatives of the State because the residue from the test could have been saved and subjected to independent tests by the defense. Also, the chemist testified that the county attorney had requested that the chemist save part of the tablet if possible. The chemist, disregarding the request of the county attorney, discarded the residue of the tablet, although it would have remained stable for several months. The present case presents different facts, because Dr. Roy testified there were no remaining samples on the shoes. In

fact, Dr. Roy was not able to complete all the tests for each sample due to insufficient quantities of samples. She also testified that had the county attorney and the defense counsel requested her not to do the tests, or not to test all the spots, she would not have conducted any tests on the shoes. No such request appears to have been made.

In *Tanner, supra*, the issues arising under § 29-1913 were not presented to the trial court because Tanner failed to follow certain procedural rules. The *Tanner* case does not support defendant's position in this case.

Although it does not involve § 29-1913(2), a more analogous case to the present one is *State v. Batchelor*, 191 Neb. 148, 214 N.W.2d 276 (1974). In *Batchelor*, the defendant was convicted of criminal sale of a controlled substance. The defendant sought to exclude the testimony of the State's chemist who analyzed the single tablet that had been seized from the defendant. The residue left from the tested tablet could not be preserved and was unfit for further testing. The chemist had testified that using less than one tablet for the testing procedures would provide questionable results. This court held that under those circumstances, it was not an abuse of discretion by the trial court to find that the State had not negligently or intentionally deprived the defendant of the right to analyze the tablet.

We have held that it is not an abuse of discretion for the trial court

> to admit expert testimony regarding the analysis of a substance necessarily consumed in testing, provided that the scientific or technical basis of the expert's opinion and the specific facts of the case on which the expert's opinion is based are before the jury and that the opposing party has the opportunity to cross-examine the expert as to these foundational matters.

*State v. Trevino*, 230 Neb. 494, 515, 432 N.W.2d 503, 518 (1988). The trial court did not abuse its discretion in denying defendant's motion to suppress.

Defendant also assigns as error the trial court's failure to grant his motion to dismiss both counts I and II made at the end of the State's case and renewed at the close of the evidence.

Defendant claims that the evidence offered to demonstrate attempted first degree murder and use of a firearm to commit a felony was insufficient as a matter of law.

After a jury has considered all the evidence and returned a verdict of guilty, that verdict may not, as a matter of law, be set aside on appeal for insufficiency of the evidence, if the evidence sustains some rational theory of guilt. *State v. Trevino, supra.*

In determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of the witnesses, determine the plausibility of explanations, or weigh the evidence. The verdict of the fact finder must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support the verdict. *State v. Andersen*, 238 Neb. 32, 468 N.W.2d 617 (1991).

> With respect to the sufficiency of the evidence to convict of attempted murder, the conviction must be sustained if the defendant's guilt is established beyond a reasonable doubt from all the evidence in the case, including such reasonable inferences as seem justified in the light of the trier of facts' own experience.

*State v. Benzel*, 220 Neb. 466, 470, 370 N.W.2d 501, 507 (1985).

Section 28-303 defines murder in the first degree as killing another person purposely and with deliberate and premeditated malice. The elements of criminal attempt are set out in § 28-201, which provides in part:

> (2) When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

> (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

The evidence in this case, when viewed in the light most favorable to the State, is sufficient to sustain a conviction of attempted murder in the first degree. The victim's testimony, if

believed by the jury, showed that defendant was present when the victim was shot.

Suzanne Peterson's testimony was supported by other testimony, as well as by the exhibits offered into evidence. All the people who provided her with medical attention stated she was very alert and conscious throughout her ordeal. These witnesses included the first officer to arrive on the scene, a paramedic who attended her at her home, the attending physician in the base hospital emergency room, and the attending physician in the University of Nebraska Medical Center emergency room, to which she was transferred after being seen at the base hospital. All testified that Suzanne Peterson was alert and in control of her faculties and not disoriented or confused.

Suzanne Peterson repeatedly told those assisting her that defendant had been in their home earlier, but that he had left. She had told them this without knowing at the time that she had been shot. The treating physician at the base hospital testified that although the bullet was in her head, there was no brain damage because the bullet had traveled across her face without touching the brain itself.

In addition to the direct testimony of Suzanne Peterson placing defendant at her home at the time of the crime, the verdict is supported by other evidence as well. Defendant's shoes were found in the trunk of his car with suspect stains on them. After testing the samples obtained from the shoes, Dr. Roy determined that the stains consisted of type A blood. Both defendant and Suzanne Peterson had blood type A.

Further, the evidence showed that in June 1990, defendant had purchased additional life insurance on Suzanne Peterson in the amount of $200,000 and had failed to cancel an existing $54,000 policy on her even after repeated requests to do so.

The evidence presented at trial is sufficient to establish, beyond a reasonable doubt, that defendant was guilty of attempted first degree murder.

In his third assignment of error, defendant contends that the trial court erred in not dismissing the charge of the use of a firearm to commit a felony because of insufficient evidence. Section § 28-1205 provides that "[a]ny person who uses a

firearm . . . to commit any felony which may be prosecuted in a court of this state . . . commits the offense of using firearms to commit a felony." Attempted first degree murder is a Class II felony. The evidence supports a finding of the jury that defendant used a gun to shoot his wife in an attempt to kill her. The bullets remaining in the victim's body were conclusive proof that a weapon was used. There is no merit in defendant's third assignment of error.

While defendant adduced evidence that he could not have been at the scene of the assault on his wife, the fact remains that the State adduced sufficient evidence which, if believed by the jury, established beyond a reasonable doubt that defendant was guilty of the crimes he was charged with committing.

The trial court did not err in any of the respects alleged by defendant. The judgment of the trial court is affirmed.

AFFIRMED.