No. 2--03--1177 filed June 30, 2006
_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 92--CF--676 |
| JOHN A. CUMBEE, | ) ) | Honorable Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

_____

JUSTICE BOWMAN delivered the opinion of the court:

Following a jury trial in 1993, defendant, John A. Cumbee, was found guilty of first degree murder (720 ILCS 5/9--1(a)(1) (West 1992)) and sentenced to life imprisonment. On appeal, we reversed defendant's conviction and remanded the case for a new trial, based on the trial court's failure to instruct the jury on venue. People v. Cumbee, No. 2--93--0923 (1995) (unpublished order under Supreme Court Rule 23). Defendant was retried in 2003 and again convicted of first degree murder and sentenced to life imprisonment. Defendant raises several arguments on appeal, including that: (1) the trial court violated this court's mandate by providing the jury with a modified venue instruction; (2) the trial court erred by denying him a Frye hearing (see Frye v. United States, 293 F. 1013 (D.C.

Cir. 1923)) to determine the admissibility of luminol testing; and (3) the trial court erred by admitting evidence of other crimes. We affirm defendant's conviction and sentence.

## I. BACKGROUND

Defendant's second trial commenced on July 23, 2003, and the following evidence was adduced. On May 6, 1992, around 6:45 a.m., the body of Kathy Twarowski was discovered in a Geo Tracker 35 to 40 feet from Rabine Drive, a private driveway in a secluded area. Defendant, a firefighter and former police officer, had worked part-time for Rabine Construction, which was located in the same area. Twarowski was covered in blood, her pants were unzipped and open, and she was in a reclined position in the driver's seat. There was a "pooling of blood" and a large blood spattering in the rear seat on the driver's side, but there were no blood spatters on the ceiling of the car. The distance between the place where Twarowski's body was discovered and defendant's home was less than one mile.

Twarowski's mother, Elizabeth (Betty), testified as follows. Twarowski began dating defendant in September 1989. At that time, she was living with her parents. In August 1990, Twarowski moved in with defendant. In May 1991, Twarowski and defendant bought a house together. Then, in June 1991, Twarowski moved back in with her parents for about three weeks. After that, she moved back in with defendant. Later, in November 1991, she moved back in with her parents, where she lived until May 5, 1992. Without going into details, Betty testified that something happened that changed the relationship between defendant and her daughter. Over objection, Betty testified that sometime in January 1992, she observed bite marks on Twarowski's face, nose, and tongue. As a

result, Bob, Twarowski's father, took her to a medical center to treat the injuries.  Pictures of the bite wounds were entered into evidence.

On May 5, 1992, around 6:30 p.m., defendant called and Betty answered the phone.  Defendant asked to speak to Twarowski, and Betty did not hear their conversation.  Twarowski then sat down to dinner with Betty, Bob, and her brother Brad.  After dinner, Twarowski went up to her room and then left the house around 8:30 p.m.  She was wearing her DePaul jacket, a gray sweatshirt, and gray socks pulled over her jeans.

Over defendant's objection, the State called several of Twarowski's friends to testify regarding defendant's prior acts.  Michelle Gast, a close friend of Twarowski's since high school, testified that on December 31, 1991, Twarowski, Gast, and a group of friends went to Chicago to celebrate New Year's Eve.  They first went to a hotel room, but had no definite plans for the evening.  As a last-minute decision, the group decided to take a cab to the Hard Rock Café around 10 p.m.  When they arrived, defendant was waiting outside the building by the entrance.  This was unusual because they were not aware that he would be there and he had not been  invited.  After one drink at the Hard Rock Café, the group left, and Gast did not recall seeing defendant again that night.

Laura Hill, another close friend of Twarowski's since high school, testified regarding an event at Bogey's Nightclub on January 11, 1992.  Around 10 p.m., Twarowski, Hill, and a group of friends arrived at the club.  They saw defendant at the club about 30 minutes after they arrived.  Defendant pulled Twarowski onto the dance floor and Hill grabbed another friend and danced "right beside them."  While dancing, Hill saw defendant bite Twarowski on the cheek.  At the time, the trial court gave a limiting instruction to the jury, explaining that the evidence was being received on the issues of defendant's identity,

intent, and motive. Hill grabbed Twarowski, who was bleeding, and took her to the bathroom. Some "bouncers" at the club then escorted defendant out. In the bathroom, Hill saw that Twarowski had been bitten on the cheek, nose, and mouth. Over objection, Hill testified that Twarowski told her that she was very afraid of defendant. When Hill and Twarowski left Bogey's Nightclub, they found that Twarowski's Geo Tracker had been vandalized. The windows were bashed in, the convertible top was slashed open, and their leather coats were missing. Hill further testified regarding an event at Frigate's Nightclub in February 1992. Hill, Twarowski, and a group of friends were leaving the club when Hill thought she noticed defendant's truck in the back of the parking lot. Twarowski and another friend left the parking lot first, and then some other friends followed in their car. The truck left next, followed by Hill and a friend. Hill was not sure, but thought the license plate on the truck read FF or FLFD, for Fox Lake Fire Department. Later testimony revealed that the license plate on defendant's truck read FLFFEMT. The truck continued to follow Twarowski's vehicle for at least five miles. When Twarowski turned, the truck went straight and followed the other car. Hill got close enough to the truck to confirm that defendant was the driver.

Brian Kiesgen, a close friend of Twarowski's since grade school, testified that he was surprised to see defendant at Bogey's Nightclub on January 11, 1992. Kiesgen saw defendant and Twarowski dancing and then went to the bathroom. When he came back, Twarowski was "all bit up," and they called the police. The court provided a limiting instruction that the evidence was being received on the issues of defendant's identity, intent, and motive.

Jessica Murray, Twarowski's best friend since grade school, testified that at the end of March or the beginning of April 1992, she and Twarowski went to Frigate's Nightclub together around 9 p.m. to meet some friends. Later that evening, defendant arrived, and Murray saw him arguing with Twarowski for about 30 minutes. Defendant was very angry and Twarowski was surprised to see him.

Helen Sibiski, who worked with Twarowski from 1990 to 1992, testified that she was like a second mother to Twarowski. On November 19, 1991, in the early morning, she received a call from Twarowski. Twarowski was "very upset" and "crying hysterically." Sibiski told Twarowski to come to her house, and Twarowski arrived about 30 seconds later. Sibiski met Twarowski in her driveway and noticed that Twarowski's face was extremely red and that she had marks on her throat. Twarowski, still crying hysterically, said "Helen, this time I thought he was going to kill me." Twarowski then showed Sibiski places on her head where it looked like small portions of her hair had been pulled out. Twarowski told Sibiski that defendant had thrown her onto a bed and put his hands around her neck.

Gordon Kiesgen testified that he was defendant's neighbor in 1992. On May 2, 1992, three days before her death, Twarowski and defendant were outside, and defendant told Gordon that he was getting back together with Twarowski. Although he and Twarowski had had some problems in the past, defendant had received counseling and felt their relationship was going in the "right direction." According to Gordon, Twarowski's car, a Geo Tracker, was kept in the garage and "out of the sight" of Twarowski's parents.

McHenry County Detective Sergeant Christopher Pandre testified as follows. On May 6, 1992, he and his partner, Undersheriff Eugene Lowery, interviewed defendant at St.

Therese Hospital, where defendant worked. When asked, defendant said he and Twarowski co-owned a Geo Tracker. Sergeant Pandre told defendant the car was found with a large amount of blood in it. Defendant responded, "Where's Kathy? You can check my alibis." When Sergeant Pandre informed defendant that Twarowski was found dead, defendant did not respond. Defendant told the officers that he last saw Twarowski on May 3, 1992, at her parents' house where he talked with her in the driveway. According to defendant, he did not see Twarowski on May 4, 5, or 6. He described their relationship as "just buddies," although when asked about the future, defendant said that he and Twarowski still had plans to get married.

Defendant told Sergeant Pandre that he was studying to a be a paramedic. On May 5, 1992, he called Twarowski at 6:30 p.m. to ask her to help him study for a paramedic examination. She agreed to do so, but then called back around 6:50 p.m. to say she was going to stay home and study. According to defendant, on May 5, 1992, he came home from work around 8:30 p.m. and called Cynthia Beck to help him study. Cynthia declined because she did not feel well. Defendant did some chores around the house, watched television, and then fell asleep around 11 p.m. Although defendant was paged by the Fox Lake Fire Department to respond to some type of call that evening, he did not respond because other on-duty firefighters handled the page.

Sergeant Pandre observed a very deep gash on defendant's right middle knuckle that had "scabbed over." Sergeant Pandre also noticed that defendant's two adjacent knuckles had scabs and that defendant had a scratch or an abrasion on the left side of his neck. According to defendant, his hand was injured when a log fell out of his fireplace the night before. Defendant also said that the abrasion on his neck was caused by a

stethoscope that rubbed back and forth. However, Sergeant Pandre observed that the stethoscope that defendant was wearing was four to five inches below the injury on his neck.

Sergeant Pandre showed defendant pictures of Twarowski taken after the biting incident on January 11, 1992. Defendant did not remember doing that and did not think he was responsible. Defendant said that he "won't hurt Kathy anymore," that he would not kill Twarowski, and that he was "in control now." According to defendant, Twarowski had confided to him that she had recently had sex with two other men. Defendant offered to show the officers his guns if Twarowski had been killed, although Sergeant Pandre never told defendant that Twarowski had been killed or how she died.

On May 8, 1992, Sergeant Pandre and his partner again questioned defendant. The officers had received secondhand information that defendant was saying that stalkers had killed Twarowski. Defendant told them that he was referring to the two men with whom she had had sex. Sergeant Pandre told defendant that they were watching his house and that they observed defendant and another individual remove two duffle bags from the home. Defendant replied that the bags contained clothes and that he was leaving the house for a few days. When asked, defendant stated that he and Twarowski had had sex on April 30, 1992, in front of the fireplace.

On June 18, 1992, a search warrant was executed and defendant was taken to a hospital where medical staff obtained samples of his blood, saliva, and hair standards. On the 40-minute ride to the hospital, defendant was calm at times but also shouted numerous profanities. At one point, defendant said, "I did it, so what." Sergeant Pandre's partner asked if he wanted to talk about it, but defendant just smiled and said nothing. When

defendant was advised that hair and blood samples had been retrieved from his home, defendant said that the samples would not do them any good and that the officers had "shit" on him. Defendant was arrested on November 4, 1992.

State expert Larry Blum, a licensed medical doctor specializing in forensic pathology, performed Twarowski's autopsy. There were 14 lacerations to Twarowski's scalp area, 7 lacerations to her face area, and her teeth were broken and cracked. Food was present in Twarowski's stomach, and Dr. Blum estimated that she died around four hours after her last meal. Following his examination, Dr. Blum opined that Twarowski died of multiple blows to the head resulting in brain injury. According to Dr. Blum, the facial injuries Twarowski suffered required a heavy metal rod-like instrument, and the fireplace poker obtained from defendant's home was consistent with the type of weapon that could have been used to cause her injuries. Dr. Blum could not say that defendant's fireplace poker was the murder weapon, and he opined that any of a number of instruments could have caused her injuries.

Dr. John Teggatz, who was also qualified as an expert in the field of forensic pathology, noticed that Twarowski's injuries had a pattern of a very linear or line-like nature. In his opinion, they were caused by an instrument more unusual than a hammer, a baseball bat, or a tire iron, for example, because those instruments have a characteristic look to them. Dr. Teggatz opined that the fireplace poker was consistent with Twarowski's injuries and that she was near death at the time she was placed in the car.

Gary Rini, who performed the luminol testing in the case, testified as follows. Rini became a police officer in 1975 and, over a period of 28 years, had taken numerous courses in forensic medicine and crime-scene investigation. He had a master's degree in

forensic science from the George Washington University in Washington, D.C., belonged to several forensic organizations, and taught courses in crime-scene investigation, bloodstain pattern analysis, and luminol testing. He and a colleague developed a technique to photograph luminol, and their article was published in 1988. Rini had testified in court over 100 times and had been qualified as an expert in luminol processing, bloodstain pattern analysis, death investigation, crime-scene investigation, and forensic investigation. Over objection, Rini was qualified as an expert by the trial court in the field of luminol processing and bloodstain pattern analysis.

Rini explained that luminol was first synthesized in 1902 and has been used as a forensic tool since the mid to late 1930s to determine whether blood is present. According to Rini, luminol is generally accepted in the scientific community as a presumptive test for the presence of blood. When luminol is sprayed on an area that contains blood, there will be a color reaction of either a bright, lasting glow or a brief glow, depending on the level of blood on the surface. Tarps are placed over any windows to darken the room so that any luminol reaction may be observed. The glowing, or chemical luminescence, is caused by the luminol's chemical composition reacting with the hemoglobin of red blood cells. The shape of the luminol reaction mimics the actual bloodstain pattern that was once visible. Luminol is used primarily because of its ability to cover large areas, and also because it is very sensitive, meaning that it can detect very minute traces of blood. However, luminol does react to substances other than blood, such as copper, copper alloys, and certain bleaches. If Rini observes a positive luminol reaction, he then performs a second presumptive test, called phenolphthalein, to see if it also reacts positively.

Phenolphthalein does not react to copper, copper alloys, or bleach products. Phenolphthalein is used by wiping a swatch of special cloth or filter paper on the stain that had the positive reaction to luminol. If the filter paper turns pink within 10 to 12 seconds of its application, this is a positive reaction for the presence of blood. Phenolphthalein is also generally accepted within the scientific community as a presumptive test for the presence of blood.

On May 7, 1992, Rini applied luminol and phenolphthalein to certain areas of defendant's house. When he applied luminol to defendant's living room carpet, the test showed "a positive indication for the presence of blood." He then tested the same areas of carpet with phenolphthalein, which also showed a positive indication for the presence of blood. In defendant's bathroom, Rini applied luminol to the bathtub, a towel hanging over the shower curtain in the bathtub, the sink, a hand towel, and a wastebasket, all of which showed a positive indication for the presence of blood. The phenolphthalein test also showed a positive indication for the presence of blood in all of these areas. When the State asked Rini for his opinion as to whether the presumptive tests indicated the presence of blood, defense counsel objected, and Rini was not allowed to answer. After both tests were reapplied to the surfaces in the living room and bathroom, the results were photographed and admitted into evidence.

On cross-examination, Rini testified that luminol and phenolphthalein are both screening tests that are not conclusive; phenolphthalein is not a confirmatory test and luminol reacts positively to a number of common items. Rini was not saying that blood was present, only that there was the possible presence of blood. Because he could not confirm the presence of blood with the luminol and phenolphthalein tests, Rini suggested sending

certain items to a crime lab for confirmatory testing to determine whether blood in fact was present.

Cynthia Torrisi, who was qualified as a forensic science expert in biology and DNA, examined the following items from defendant's home: two bath towels, several carpet samples, a wastebasket, a bath mat, a fireplace poker, and hairs found on a push broom. When Torrisi performed a presumptive test using phenolphthalein on one bath towel, a small spot reacted positively. Torrisi then did a confirmatory test, which came out negative, meaning the stain could not be identified as human blood. Possible reasons that the stain could not be identified as human blood were that it was not blood, the stain was not big enough, or the stain was degraded. After performing the confirmatory test, the stain was consumed and could not be tested further. Torrisi then performed a presumptive test using phenolphthalein on the second towel, and there were several small stains that reacted positively. Torrisi then cut one of the stains out of the towel and performed a confirmatory test, which came out negative.

Next, Torrisi performed a presumptive test on three pieces of carpeting, which produced negative results. As a result, no confirmatory tests were performed on those items. Another piece of carpet tested positive when the presumptive test was applied, although the confirmatory test came out negative. In addition, no blood was found on the wastebasket or bath mat, and all of the presumptive tests applied to the fireplace poker came out negative. Torrisi also viewed hairs from the push broom under a microscope and observed a few hairs with "tiny red crusts." After she removed the crust from the hairs, she performed a confirmatory test that identified human blood. The parties stipulated that she

found no seminal material or spermatozoa on any of the vaginal, oral, or rectal swabs or smears taken from Twarowski.

Laurie Lee, who was qualified as an expert in the field of hair, fiber, and microscopy, testified that in May 1992, she received from Torrisi hairs and fibers for examination and comparison. Head hair standards and pubic hair standards were taken from Twarowski and her clothes. Hair standards were also taken from defendant. When Lee examined hairs and fibers found on defendant's push broom, she observed approximately 100 head hairs and hair fragments that were consistent with Twarowski's head hair standards and dissimilar to defendant's head hair standards. Those 100 head hairs had broken roots, meaning that they were removed with some force. In addition, Lee observed approximately 10 head hairs and hair fragments that were consistent with defendant's head hair standards and dissimilar to Twarowski's head hair standards.

Lee also recovered fibers from a wastebasket in defendant's home and compared them to other fibers. Her examination showed that several gray rayon fibers from the wastebasket were consistent with known fibers from Twarowski's socks. In addition, she testified that purple/blue/green acrylic fibers from the wastebasket were consistent with purple/blue/green acrylic fibers found on Twarowski's right sock, her shirt, and the sheet that she was wrapped in. On cross-examination, Lee stated that she could not be sure that the fibers from the wastebasket came from Twarowski's sock but that they could have. She also admitted that, in her report, she recorded that a "few" of the purple/blue/green acrylic fibers and numerous other fibers of various colors were dissimilar to the known fibers found on Twarowski's clothing.

William Frank was qualified as an expert in the field of forensic biology, hair, fiber, and DNA analysis. In August 1996, Frank received DNA standards from Twarowski and defendant. Frank examined two bath towels taken from defendant's bathroom. On one of the towels, the extracted DNA matched defendant's DNA profile. On the other towel, Frank identified three areas of DNA: one area matched defendant's DNA, and the other two areas were a mixture of DNA from both defendant and Twarowski.

Bryan Rogers, who was incarcerated in the McHenry County jail at the same time as defendant, testified that he had been convicted of forgery and theft. In July 1996, he was arrested twice in one week for driving under the influence of alcohol. As a result of the arrests, Rogers served two weeks in jail, where he met defendant. In the middle of July 1996, Rogers asked defendant why he was wearing a yellow band on his wrist. Defendant first said "for an assault," and then said he was in jail for attempted murder. According to Rogers, defendant told him the following. He and a girl were drinking when defendant became angry and hit her with a fireplace poker. Defendant got carried away and did not mean to kill her. Defendant further told Rogers that he "dropped the body off in McHenry County" because he could not get tried in two counties. Rogers was not promised anything in exchange for his testimony, and he stated that he went straight to the State's Attorney to relay this information when he was released in 1996.

Patricia Becht testified that, on May 5, 1992, at 9:15 p.m., defendant called her home to speak to her daughter, Cynthia. Becht informed defendant that her daughter was ill and sleeping, and that was the extent of their conversation. Cynthia testified that defendant called the house but she never spoke to him.

Richard Barnes, a firefighter in Kenosha, testified that he was defendant's classmate for paramedic training at Victory Memorial Hospital over a period of seven or eight months in 1991 and 1992. Following a test on April 15, 1992, defendant and Barnes spent the evening together at a restaurant and several bars. Defendant told Barnes that he was having difficulties in his relationship with Twarowski, that it was "going sour," and that she was "driving him crazy." Defendant told Barnes that Twarowski was having a hard time being in a relationship with him, because she was young, wanted to experience life and date other people, and did not want to be tied down to one person.

Near the end of the State's case, the jury took a bus tour of defendant's home, the Twarowski home, and the place where Twarowski was found in her vehicle. The jury, the trial judge, the prosecutors, the court reporter, and a defense attorney traveled on the bus, while defendant rode in a separate vehicle with one of his lawyers and with sheriff's deputies.

After the State rested, Sergeant William Lutz of the McHenry County sheriff's police department testified on behalf of defendant. According to Sergeant Lutz, who interviewed Rogers regarding defendant's alleged statement, Rogers did not tell him that defendant and Twarowski were drinking on the night of her death. In addition, Sergeant Lutz wrote in his report that defendant told Rogers, "They're trying to get me for hitting her with a fireplace poker."

Jack Welty, an expert in firearms and tool mark identification, testified that he received Twarowski's bone skull fragments and the fireplace poker for testing. Based on his examination of the bone skull fragments, Welty could not determine a specific type of tool or object that could have produced those tool marks. In his opinion, the fireplace poker

could not be identified or eliminated as having made the impressions on the bone skull fragments.

Nancy Jones, a medical doctor and expert in forensic pathology, testified that after reviewing police reports, medical examiners' reports, photographs, and testimony, she concluded that the instrument that caused Twarowski's injuries was not the fireplace poker, but a long, cylindrical object. According to Dr. Jones, the instrument that was used left evidence of itself in Twarowski's skull. Jack Nowicki, a forensic scientist in trace evidence who worked for the Illinois State Police, testified that he examined the skull fragments and found tiny black particles embedded on them. He performed chemical testing on the particles and determined that they were likely a polymer-type material, such as paint, plastic, or vinyl. Nowicki concluded that the material on the fireplace poker was not what he found on the skull fragments.

Loretta Dixon, a social friend of defendant's, testified that she met defendant while working at St. Therese Hospital. On May 5, 1992, after 9 p.m., defendant called her and the conversation lasted about 20 minutes. She did not notice anything unusual about his voice. They made plans to meet the next morning, so that defendant could help her move items from a storage facility to her new residence. Defendant met her at about 8 a.m. and helped her until around 11 a.m., when he left for work. Dixon did not see any marks or scratches on defendant's hands, knuckles, or neck. She testified that she had dated defendant twice, once before Twarowski's death and once after.

Defendant's final witness was Samantha Toler, who used to babysit defendant's children from a previous marriage. On May 5, 1992, at approximately 11:30 p.m., Toler was leaving her mother's home in Spring Grove when she saw a car coming at her in the

middle of the road.  According to Toler, the driver had dark hair and a fuller face, and the passenger in the car was not moving.  She did not know whether the driver was defendant.

At the jury instruction conference, defendant objected to the State's venue instruction and a special interrogatory for an extended term sentence based on brutal and heinous behavior .  The court gave the instructions, and the jury found defendant guilty of first degree murder.   The jury also found that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty.  Defendant moved for a new trial, and the trial court denied this motion.  Defendant was sentenced to life imprisonment and now appeals.

## II.  ANALYSIS

### A.  Venue Instruction

Defendant first argues that the trial court ignored this court's mandate to give the venue instruction offered by defendant at the first trial.  According to defendant, the trial court erred by  providing a modified venue instruction based on section 1--6(c) of the venue provision of the Criminal Code of 1961 (Code) (720 ILCS 5/1--6(c) (West 1992)).

In analyzing defendant's claim, we briefly summarize the pertinent facts surrounding the first trial.  In 1992, a McHenry County grand jury returned an indictment charging defendant with first degree murder in that he caused the death of Twarowski in McHenry County.  At the first trial, the State's theory was that Twarowski's injuries were inflicted in defendant's home in Lake County, defendant had transported her body to McHenry County, and it was uncertain where death ensued.  Defendant moved for a change of venue, maintaining that the only evidence linking McHenry County to the case was the fact that

Twarowski's body was found in a car in McHenry County. After the trial court denied his motion for a change of venue, defendant tendered a venue instruction requiring the State to prove beyond a reasonable doubt that the murder occurred in McHenry County. See Illinois Pattern Jury Instructions, Criminal, No. 2.07 (3d ed. 1992) (hereinafter IPI Criminal 3d). The trial court refused to give the venue instruction, and on this basis, we reversed defendant's conviction and remanded the case for a new trial. Specifically, we stated:

"Here, there is no question that venue was disputed throughout the case. There is also no question that the State must prove venue beyond a reasonable doubt. Under these circumstances, it was incumbent upon the trial court to give the venue instruction offered by defendant. Its failure to do so was reversible error. See People v. Sanders (1985), 129 Ill. App. 3d 552, 553, failure to give essential jury instructions serves to deprive the accused of a fair trial." Cumbee, slip op. at 9.

Prior to defendant's second trial, the trial court was asked to make a ruling regarding the venue instruction that would be given to the jury. Recognizing that it was bound to follow this court's mandate, the trial court stated that it would tender IPI Criminal 3d No. 2.07, which provides that "[t]he State must prove beyond a reasonable doubt that the offense[s] of ___ occurred in ___ County, Illinois." However, the trial court stated that it would also tender a non-IPI instruction from section 1--6(c) of the venue statute in effect at the time of the 1992 murder. Section 1--6(c) states: "If cause of death is inflicted in one county and death ensues in another county, the offender may be tried in either county. If neither the county in which the cause of death was inflicted nor the county in which death ensued are known before trial, the offender may be tried in the county where the body was found." 720 ILCS 5/1--6(c) (West 1992).

As both defendant and the State agree, the State's theory changed in the second trial.  Instead of arguing that Twarowski was killed in defendant's home in Lake County, the State argued during closing arguments that it did not know where Twarowski was killed and that it did not have to prove where she was killed.  Rather, the State argued that it had to prove where the body was found, which was in McHenry County.  The jury received two venue instructions, the first of which stated, "The State must prove beyond a reasonable doubt that the offense of First Degree Murder occurred in McHenry County, Illinois."  The second venue instruction stated as follows:

"To sustain the charge of First Degree Murder, the State must prove the following propositions:

First: That the defendant performed the acts which caused the death of Kathleen Twarowski; and

Second: That when the defendant did so, he intended to kill or do great bodily harm to Kathleen Twarowski; and

Third: That the offense of First Degree Murder occurred in McHenry County, Illinois; but if neither the county in which the cause of death was inflicted nor the county in which the death ensued are known before trial, that Kathleen Twarowski's body was found in McHenry County."

According to defendant, the modified venue instruction deprived him of a fair trial because the State was allowed to argue to the jury that it did not have to prove venue.

The State gives two reasons why the modified venue instruction was proper, the first of which is unpersuasive.  The State first argues that, when the retrial occurred in 2003, the State was no longer required to prove venue in a specific county.  The State relies on an

amendment to the general venue statute, effective August 11, 1995, which provides that "[t]he State is not required to prove during trial that the alleged offense occurred in any particular county in this State." 720 ILCS 5/1--6(a) (West 2002). While the State concedes that the amendment is not retroactive (People v. Digirolamo, 179 Ill. 2d 24, 50 (1997)), it urges this court to apply the amendment to the date of the retrial, 2003, rather than to the date of the offense, 1992. However, "the committee note to the venue jury instruction indicates that the venue 'instruction should continue to be used in cases in which the alleged offense was committed before August 11, 1995.' " People v. Holmes, 292 Ill. App. 3d 855, 861 (1997), quoting IPI Criminal No. 2.07, Committee Note at 6 (3d ed. Supp. 1996). Because defendant's alleged offense occurred in 1992, the State was required to prove venue at his retrial.

Nevertheless, we agree with the State that the modified venue instruction given in this case was proper. As stated, section 1--6 of the Code sets forth the general venue provision for criminal cases. Digirolamo, 179 Ill. 2d at 49. Courts have consistently applied the provisions of this statute to determine questions regarding substantive as well as procedural aspects of venue. People v. Carroll, 260 Ill. App. 3d 319, 327-28 (1992). "Therefore, in order to sufficiently establish venue in a particular county the State must prove beyond a reasonable doubt only that which is required by section 1--6." (Emphasis added.) Carroll, 260 Ill. App. 3d at 328. Prior to the amendment, the general rule for establishing venue under section 1--6(a) was that the State had to prove beyond a reasonable doubt that the acts that constituted the offense occurred in the county alleged in the indictment. Carroll, 260 Ill. App. 3d at 329. However, section 1--6 also provides

several exceptions to this general rule (Carroll, 260 Ill. App. 3d at 329), including subsection (c), which the trial court incorporated into the venue instruction.

As discussed, the State's theory changed from the first trial to the second trial. In the first trial, the parties stipulated that the State's theory was that Twarowski's murder took place at defendant's home in Lake County. In our unpublished order, we noted this fact and other facts relating to venue in reversing the trial court and remanding for a new trial. Essentially, we stated that: (1) the State had to prove venue beyond a reasonable doubt; (2) given the State's trial theory, venue was disputed; and (3) the trial court erred by refusing defendant's venue instruction. While defendant argues that, at his second trial, the trial court "in essence, overruled this Court's Rule 23 Order" by providing a modified venue instruction based on section 1--6(c), we disagree.

At the second trial, the State no longer argued that Twarowski was killed in defendant's home in Lake County. Instead, the State argued that the county where the fatal blow was struck and the county where she died could not be determined with certainty. Thus, the jury was instructed in accordance with section 1--6(c), an exception to the general rule for establishing venue, which states that "[i]f neither the county in which the cause of death was inflicted nor the county in which death ensued are known before trial, the offender may be tried in the county where the body was found." 720 ILCS 5/1--6(c) (West 1992). Specifically, the jury was instructed that the State must prove "[t]hat the offense of First Degree Murder occurred in McHenry County, Illinois; but if neither the county in which the cause of death was inflicted nor the county in which the death ensued are known before trial, that Kathleen Twarowski's body was found in McHenry County." We agree with the State that this modified venue instruction properly advised the jury in

accordance with the State's trial theory, the evidence presented at trial, and the venue statute in effect at the time of the 1992 murder. See also People v. Page, 196 Ill. App. 3d 285, 292 (1990) (the element of venue was proved beyond a reasonable doubt for murder conviction where section 1--6(c) was satisfied). Accordingly, the trial court did not abuse its discretion in submitting this instruction to the jury. See People v. Moore, 343 Ill. App. 3d 331, 338-39 (2003) (the standard of review in determining whether a trial court's submission of a jury instruction was erroneous is abuse of discretion).

## B. Admissibility of Luminol Testing under Frye

Defendant next argues that the trial court erred by denying his motion for a Frye hearing to determine the admissibility of luminol testing. Because luminol reacts with other substances such as copper, copper alloys, and certain bleaches, defendant maintains that it is not reliable as a presumptive test for the presence of blood, but only for the possible presence of blood. Defendant also points out that there was no blood found in the areas in defendant's home where the luminol reacted, rendering the luminol evidence "very misleading" and confusing for the jury.

It is well settled that the admission of expert testimony in Illinois is governed by the standard first expressed in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). In re Commitment of Simons, 213 Ill. 2d 523, 529 (2004). Under the Frye standard, scientific evidence is admissible at trial only if the methodology or scientific principle upon which the expert's opinion is based is sufficiently established to have gained "general acceptance" in the particular field in which it belongs. Simons, 213 Ill. 2d at 529-30. General acceptance does not mean universal acceptance and does not require that the methodology be accepted by unanimity, consensus, or even a majority of experts. Donaldson v. Central

Illinois Public Service Co., 199 Ill. 2d 63, 77-78 (2002). Furthermore, the trial court applies the Frye test only if the scientific principle, technique, or test offered by the expert is "new" or "novel." Donaldson, 199 Ill. 2d at 78-79. A scientific technique is new or novel if it is " 'original or striking' " or does " 'not resembl[e] something formerly known or used.' " Donaldson, 199 Ill. 2d at 79, quoting Webster's Third New International Dictionary 1546 (1993). We review de novo a trial court's Frye ruling. Simons, 213 Ill. 2d at 531.

We note that prior to trial, defendant requested a Frye hearing based on expected testimony from State expert Rini, who had performed luminol testing at defendant's home. According to defendant, because evidence of luminol testing was unreliable and not generally accepted in the scientific community, Rini's testimony was inadmissible. The State countered that luminol testing was not novel and had gained general acceptance in other jurisdictions. The trial court denied defendant's motion for a Frye hearing, finding that (1) luminol testing was not new or novel and had been admitted in court proceedings as early as 1955; (2) it was "generally accepted in the scientific community for the presumptive test indicative of blood"; (3) defendant's arguments went to the weight and not the admissibility of the evidence; and (4) several other jurisdictions have found that luminol testing is admissible under Frye.

As defendant points out, this is an issue of first impression in Illinois. Thus, it is instructive to consider other states' treatment of luminol testing. See Simons, 213 Ill. 2d at 531 (in conducting de novo review, we may consider the trial court record as well as court opinions from other jurisdictions). The trial court is correct that several other jurisdictions have held that luminol testing is admissible under Frye. For example, in Mackerley v. Florida, 900 So. 2d 662 (Fla. App. 2005), the court held that luminol testing has been

generally accepted in the scientific community. Mackerley, 900 So. 2d at 663. Likewise, in People v. Wooten, 283 A.D.2d 931, 932, 725 N.Y.S.2d 767, 769 (2001), the court stated that the lower court did not err in denying the defendant's motion for a Frye hearing concerning a "lumi-lite" test that used luminol. Wooten, 283 A.D.2d at 932, 725 N.Y.S.2d at 769. In reaching its conclusion, the court specifically noted that the use of luminol is not novel and that its use is universally accepted. Wooten, 283 A.D.2d at 932, 725 N.Y.S.2d at 769. Furthermore, in State v. Canaan, 265 Kan. 835, 964 P.2d 681 (1998), the Kansas Supreme Court held that the use of luminol is universally accepted as a presumptive test for blood and thus satisfies the Frye test. Canaan, 265 Kan. at 852, 964 P.2d at 694. The court noted that the State sought its admission as a presumptive test and that the scientific technique upon which the luminol test is based has been generally accepted as reliable. Canaan, 265 Kan. at 852, 964 P.2d at 694. In addition, the court noted that the defendant had elicited testimony that informed the jury that luminol also reacts with other substances. Canaan, 265 Kan. at 853, 964 P.2d at 694. According to the court, "[t]he fact that luminol also detects some other substances is irrelevant to its universal acceptance as a presumptive blood test. This fact goes to the weight, not the admissibility, of the evidence." Canaan, 265 Kan. at 852-53, 964 P.2d at 694; see also State v. Stenson, 132 Wash. 2d 668, 717-18, 940 P.2d 1239, 1264 (1997) (since the jury repeatedly heard that the phenolphthalein test was only presumptive for the presence of blood and did not confirm that the stains were in fact human blood, the question was one of weight and not of admissibility).

However, as defendant points out, some jurisdictions have held that positive luminol test results are inadmissible without follow-up tests that confirm the presence of human

blood related to the crime.  See State v. Daniels, 179 S.W.3d 273, 283 (Mo. 2005) (while positive luminol test results may satisfy Frye if offered only for the limited purpose of being a preliminary test for the presence of blood when additional scientific tests confirm the presence of blood, a Frye hearing is necessary to determine whether a positive luminol reaction conclusively proves the presence of blood without scientifically accepted corroborative evidence); Brenk v. State, 311 Ark. 579, 593, 847 S.W.2d 1, 9 (1993) (results of luminol test showing the possible presence of blood should not have been admitted in the absence of follow-up procedures to establish that the substance causing the luminol reaction was, in fact, human blood related to the charged crime); see also State v. Fukusaku, 85 Haw. 462, ___ n.30, 946 P.2d 32, 66-67 n.30 (1997) (although the trial court ruled that luminol and phenolphthalein tests were "scientifically reliable and valid," the test results were more prejudicial than probative without confirmatory tests that conclusively established the presence of blood).

In considering these different approaches, we are more persuaded by the jurisdictions holding that luminol testing is admissible under Frye.  According to our supreme court, "[o]nly novelty requires that the trial court conduct a Frye evidentiary hearing to consider general acceptance." Donaldson, 199 Ill. 2d at 79.  In this case, State expert Rini testified regarding the history of luminol, explaining that luminol was first synthesized in 1902 and has been used since the mid to late 1930s as a forensic tool to indicate the presence of blood.  See Wooten, 283 A.D.2d at 933, 725 N.Y.S.2d at 770 (the first reported case to use luminol for crime investigation dated back to 1955).  As discussed, courts in Florida, New York, and Kansas recognize that the use of luminol is not novel and is universally accepted as a presumptive test for blood.  See also Canaan, 265

Kan. at 852, 964 P.2d at 694 (noting that Florida, California, and Alabama all permit the introduction of evidence that is presumptive for blood).  Moreover, we agree with the Canaan court that "[t]he fact that luminol also detects some other substances is irrelevant to its universal acceptance as a presumptive blood test."  Canaan, 265 Kan. at 852, 964 P.2d at 694; see also Stenson, 132 Wash. 2d at 668, 940 P.2d at 1239 (the fact that the phenolphthalein test was only presumptive went to the weight, rather than the admissibility, of the test).  As a result, the lack of additional, confirmatory evidence that blood was actually present in defendant's home did not render the luminol test results inadmissible in this case.  After listening to cross-examination and closing arguments, the jury was to determine what significance to attach to the luminol testing.  See Commonwealth v. Duguay, 430 Mass. 397, 401, 720 N.E.2d 458, 462 (1999) (the court declined to condition the admissability of the results of a presumptive blood test (ortho-tolidine) on the availability of additional confirmatory evidence; that argument went only to the weight of the evidence, not to its admissibility); see also State v. Moseley, 336 N.C. 710, 721, 445 S.E.2d 906, 912 (1994) (State Bureau of Investigation agent was permitted to testify that phenolphthalein testing revealed "indications of the presence of blood" on the defendant's boots and clothing, even though the quantities were insufficient to determine definitively whether blood was present).

Defendant also argues that, although luminol is only a screening test for the "possible presence" of blood, the luminol test results were used by State expert Rini and the prosecution to claim the presence of human blood in defendant's home.  Specifically, defendant argues that Rini testified on direct examination that luminol was a "presumptive test for the presence of blood" and then contradicted himself on cross-examination by

testifying that it indicated the "possible presence of blood." In analyzing how the evidence of luminol testing was used during trial, we disagree with defendant's characterization of the State's case. On direct examination, Rini testified that luminol was a presumptive test for the presence of blood. He explained that luminol reacts positively to other substances and that the positive results he received in defendant's home showed only "a positive <u>indication</u> for the presence of blood." (Emphasis added.) At no time did Rini testify that luminol was a confirmatory or conclusive test for the presence of blood. Because of the possibility of false positives, Rini further testified that he used a second presumptive test, phenolphthalein, to see if it produced the same result as luminol. However, when the State asked Rini for his opinion as to whether the presumptive tests utilized in this case indicated the presence of blood, Rini was not allowed to answer.

Furthermore, on cross-examination, defense counsel fully explored the limitations of both luminol and phenolphthalein by eliciting testimony that these tests were nothing more than "screening" tests. Rini explained that luminol (and phenolphthalein) were not conclusive or confirmatory, and that, despite the positive test results, he could not confirm the presence of human blood on any of the items tested in defendant's home. Rather, he testified that certain items were sent to a crime lab for confirmatory testing as to whether blood in fact was present.

Defendant also challenges the following comments made by the prosecutor during closing arguments:

> "[Y]ou met Gary Rini who was a crime scene investigator, an expert in luminol and he described to you the care they took in trying to figure out if anything had happened at that house. He described in detail the luminol process for you and how

he sprayed the luminol and waited for a reaction and that if he got a reaction he went on to a second test, the phenolphthalein. If he got a positive reaction from the phenolphthalein he documented one more time that luminol and you were able to see it in the areas of the house where he had a luminol reaction and one of the points of interest of those reactions is if you consider the wastebasket, the sink, and the tub and the towels, they're all points of clean-up and Gary Rini said the <u>luminol and the phenolphthalein is a presumptive test for the possibility of blood</u> but it also can be used to determine the clean-up of <u>possible blood</u>.

* * *

     *** [Defendant] called the officers profanities. 'You assholes will never be
     able to

prove I did it. Yeah, I did it. So what. These hair and blood samples aren't going to do any

good. You know why? You've got shit on me.' That's when [defendant] is not in control and

     [defendant] couldn't explain <u>the possibility of blood in his home</u> after being shown
     the very luminol photos that you saw during this trial." (Emphasis added.)

The trial court sustained defense counsel's objection to the prosecutor's last statement.

     Contrary to defendant's assertion, Rini and the prosecution never claimed that luminol conclusively established the presence of human blood in defendant's house. Rather, as discussed, luminol was carefully described as a presumptive or screening test that was capable of producing false positives and that indicated only the possible presence of blood. Defense counsel demonstrated the limits of the positive luminol test results by

stating during closing arguments that: (1) the tests Rini performed were preliminary screening tests and not confirmatory tests; (2) Torrisi performed confirmatory tests on the carpet, the bath mat, the wastebasket, and the towels; and (3) these tests all came out negative despite the positive luminol test results. See Brenk, 311 Ark. at 600-01, 847 S.W.2d at 13 (Brown, J., dissenting, joined by Hays, J.) (the luminol test is probative as a preliminary screen for the presence of blood, no one contended it is conclusive for human blood or that it does not show positive for other substances, such points were explored by defense counsel on cross-examination and argued to the jury, and thus, the defendant's argument went to weight, rather than admissibility).

As a final point, we find defendant's reliance on People v. Wheeler, 334 Ill. App. 3d 273 (2002), unpersuasive, as it is distinguishable in several respects. First, Wheeler involved a different and less recognized preliminary test for the presence of blood, the Leuco-Malachite Green (LMG) or "invisible blood" test. Wheeler, 334 Ill. App. 3d at 275. Second, the State witness who performed the test testified at trial that LMG was a "presumptive test" for the presence of blood and that a positive LMG reaction " '[would] give you a presumption that this is blood.' " Wheeler, 334 Ill. App. 3d at 284. While the witness acknowledged that as many as 50 other substances could react to LMG, he opined that " '[i]t could be another substance, but it is presumed to be blood.' " Wheeler, 334 Ill. App. 3d at 278. Accordingly, the appellate court recognized that, although LMG is generally accepted in the scientific community as a preliminary test for the presence of blood, it was not an accepted method for presuming the presence of blood, contrary to the State witness's testimony at trial. Wheeler, 334 Ill. App. 3d at 285. Unlike Wheeler, the trial court in this case did not allow Rini to opine whether the positive luminol test results indicated the

presence of blood.  Thus, while Rini testified that luminol is a presumptive or screening test for the presence of blood, he also explained that, because luminol reacts to other substances, positive results indicate only the "possible presence of blood."

In sum, luminol testing is not novel and is universally accepted as a presumptive test for blood.  In addition, defense counsel fully explored the limitations of the test and Rini was not allowed to opine whether blood was actually present on the items that tested positively in defendant's home.  Thus, the evidence regarding luminol testing was admissible under Frye and the trial court properly denied defendant's request for a Frye hearing.

### C.  Evidentiary Issues

### 1.  Other-Crimes Evidence

Defendant next argues that the trial court erred by admitting evidence of his "alleged prior bad acts" against Twarowski, because it was not relevant and because it was more prejudicial than probative.  According to defendant, the following evidence should not have been admitted: (1) Sibiski's testimony that on November 19, 1991, Twarowski, crying hysterically, came to her house with marks on her throat and places on her head where it appeared that small portions of her hair had been pulled out; (2) testimony from Gast and Hill that defendant appeared unexpectedly at the Hard Rock Café in Chicago when Twarowski and her friends arrived to celebrate New Year's Eve; (3) Hill's testimony that on January 11, 1992, defendant pulled Twarowski onto the dance floor at Bogey's Nightclub and bit her on the cheek, nose, and mouth, causing Twarowski to bleed; (4) Hill's testimony that in February 1992, defendant followed Twarowski's vehicle in his truck as she left Frigate's Nightclub; and (5) Murray's testimony that she witnessed an argument between

defendant and Twarowski lasting about 30 minutes at Frigate's Nightclub in March or April 1992.

The State responds that the law of the case doctrine bars defendant from raising this issue and that the other-crimes evidence was properly admitted to show defendant's identity, intent, and motive. We agree with the State on both points.

Under the law of the case doctrine, issues presented and disposed of in a prior appeal are binding and will control in the trial court upon remand, as well as in the appellate court in a subsequent appeal (Zabinsky v. Gelber Group, Inc., 347 Ill. App. 3d 243, 248 (2004)), unless the facts presented are so different as to require a different interpretation (Bilut v. Northwestern University, 296 Ill. App. 3d 42, 47 (1998)). Absent substantially different facts, a party will not be allowed to reargue issues previously decided by the appellate court. Bilut, 296 Ill. App. 3d at 47. "The trial court's decision not to revisit a matter previously litigated in reliance upon the law of the case doctrine will not be reversed absent an abuse of discretion." People v. Daniels, 346 Ill. App. 3d 350, 355 (2004).

In the prior appeal, defendant made the same argument he makes here; namely, that the trial court erred by admitting evidence of prior acts of violence he committed against Twarowski. At the first trial, Sibiski, Hill, and Murray testified regarding defendant's prior bad acts against Twarowski. In particular, they testified regarding the five incidents challenged by defendant in this appeal. Relying on People v. Illgen, 145 Ill. 2d 353 (1991), this court held in the prior appeal that "evidence pertaining to defendant's physical abuse of the victim is relevant to show defendant's criminal intent and, thus, is admissible at retrial. However, we note that hearsay statements pertaining to the subject incidents must be supported by adequate indicia of reliability to be admissible." Cumbee, slip op. at 11.

At the second trial, Sibiski, Hill, and Murray again testified regarding defendant's acts of violence against Twarowski, and their testimony at the second trial was nearly identical to their testimony at the first trial. Because the facts in the trial court on remand and in this appeal are substantially the same as those in the prior appeal, the facts do not require a different interpretation. See Bilut, 296 Ill. App. 3d at 47. Accordingly, this court's decision in the prior appeal was binding on the trial court on remand and is now binding on this court. See Bilut, 296 Ill. App. 3d at 47; see also People v. Wilson, 257 Ill. App. 3d 670, 700 (1993) (when the evidence offered at the two trials is the same, or substantially the same, the law of the case doctrine will preclude review of defendant's argument).

Even if defendant's contention was not barred by the law of the case doctrine, our conclusion would be the same. Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crimes. People v. Wilson, 214 Ill. 2d 127, 135 (2005). For example, other-crimes evidence is admissible to show modus operandi, intent, identity, motive, absence of mistake (Wilson, 214 Ill. 2d at 135-36), or a dislike or attitude toward the victim (People v. Moser, 356 Ill. App. 3d 900, 913 (2005)).

We agree with the State that the other-crimes testimony fits squarely within the recognized exceptions, which allow such evidence to show defendant's identity, intent, and motive. Incidents in which defendant physically abused and "stalked" Twarowski were relevant and admissible for the purpose of establishing defendant's identity, intent, and motive, and the trial court properly instructed the jury of the limited purpose of this evidence. See People v. Ranstrom, 304 Ill. App. 3d 664, 674-75 (1999) (detailed evidence of the defendant's profound obsession with his former girlfriend, including instances where

he stalked, terrorized, and burglarized her, were properly admitted to show the defendant's intent and motive for the attack on her new boyfriend).

## 2. Out-of-Court Statements

In a related argument, defendant also contends that the trial court erred by admitting hearsay statements that Twarowski made to Sibiski regarding the November 19, 1991, incident. According to Sibiski, when Twarowski came to her house crying hysterically, she said, "Helen, this time I thought he was going to kill me." Sibiski further testified that Twarowski told her that "[defendant] had thrown her on the bed and put his hands around her neck." Prior to Sibiski's testimony, the trial court heard arguments on the admissibility of these statements and ruled that they were admissible under the spontaneous declaration or excited utterance exception to the hearsay rule. Relying on Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), defendant first argues that the State's use of Twarowski's statements violated his sixth amendment right to confrontation.

Prior to Crawford, hearsay was admissible against a criminal defendant if the declarant was unavailable and the statement bore sufficient indicia of reliability. People v. Purcell, 364 Ill. App. 3d 283, 294 (2006). Then, in Crawford, the Supreme Court reinterpreted the confrontation clause, holding that the "testimonial" hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. While Crawford did not articulate a comprehensive definition of "testimonial" statements, it did provide some examples of the core class of testimonial statements: (1) ex parte in-court testimony; (2) extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions,

prior testimony, or confessions; (3) statements that were made under circumstances that would lead an objective witness reasonably to believe that the statements would be available for use at a later trial; and (4) statements taken by police officers in the course of interrogations. Crawford, 541 U.S. at 51-52, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364.

Although there is uncertainty regarding the exact definition of "testimonial" statements, the Appellate Court, First District, has held that Crawford does not apply to statements made to nongovernmental personnel, such as family members or physicians. See People v. R.F., 355 Ill. App. 3d 992, 1000 (2005). However, in In re T.T., 351 Ill. App. 3d 976 (2004), the First District also held that certain statements the victim made to nongovernmental personnel, an examining physician, were testimonial and thus their admission violated the confrontation clause. In re T.T., 351 Ill. App. 3d at 992-93. The court reasoned that, when the content of a victim's statement concerns fault or identity, such a statement is testimonial and thus is admissible only if the declarant testifies at trial and is subject to cross-examination. In re T.T., 351 Ill. App. 3d at 993. In Purcell, a recent case decided by this court, we adopted the reasoning of In re T.T., which focused on the nature of the testimony rather than the official or unofficial status of the person testifying as to the out-of-court statement. Purcell, 364 Ill. App. 3d at ___. Although Purcell and In re T.T. involved statements to physicians, and here we are presented with statements to a close friend, Purcell suggests that Twarowski's statements to Sibiski were testimonial given their nature. Specifically, Twarowski made accusatory statements to Sibiski, describing a physical confrontation where defendant put his hands around her neck to the point where she feared that he would kill her. But see People v. West, 355 Ill. App. 3d 28, 41 (2005) (unavailable victim's statements to a woman from whom she received assistance after an

assault were not testimonial in nature because the woman was <u>not acting as a</u> <u>governmental officer</u> seeking evidence in anticipation of a potential criminal prosecution, but was merely a "concerned citizen" with altruistic intentions).  However, even assuming that Twarowski's statements were testimonial and thus that their admission was a violation of <u>Crawford</u>, we conclude that the error was harmless beyond a reasonable doubt.

Constitutional error may be harmless beyond a reasonable doubt where there is overwhelming  other evidence to support the conviction.  <u>R.F.</u>, 355 Ill. App. 3d at 1001. The trial testimony of Twarowski's friends and the investigating officers, coupled with the forensic evidence, overwhelmingly established defendant's guilt.  Several witnesses testified that defendant would show up unexpectedly at nightclubs where Twarowski was present.  On various occasions, defendant was seen arguing with Twarowski and then following her after she left.  In one incident, defendant bit Twarowski's face, causing injuries to her cheek, nose, and mouth that required medical treatment.  Sibiski testified that she observed marks on Twarowski's throat and places on her head where it appeared that her hair had been pulled out.  In addition, defendant made incriminating statements to the investigating officers and had fresh abrasions on his hands and neck the day after Twarowski's body was discovered.  Finally, Twarowski's body was found less than a mile from defendant's home and in an area where he had worked, and there was forensic evidence from defendant's push broom and wastebasket linking him to the murder. Accordingly, the admission of Twarowski's statements to Sibiski was harmless beyond a reasonable doubt.

Defendant also argues that these statements were inadmissible because they did not bear sufficient indicia of reliability.  See <u>R.F.</u>, 355 Ill. App. 3d at 1000 (when an out-of-

court statement is nontestimonial, the indicia of reliability framework of <u>Ohio v. Roberts</u>, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), and the hearsay exceptions continue to apply).  However, our harmless-error analysis disposes of defendant's challenge on this basis.


### III.  CONCLUSION

For all of these reasons, the McHenry County circuit court's judgment is affirmed.

Affirmed.

GROMETER, P.J., and CALLUM, J., concur.