IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37665-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES EDWARD BERNHARD, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — James Bernhard appeals from his convictions for second degree rape and second degree assault. He challenges the superior court's admission of expert testimony that BLUESTAR testing found the presence of blood on sample areas of his residence where he allegedly raped his wife. Assuming we affirm his convictions, Bernhard asks that we conclude that his sentencing counsel performed ineffectively when failing to argue that his two convictions constituted the same criminal conduct. We rule that the superior court did not abuse its discretion when admitting the contested evidence and thereby affirm Bernhard's convictions. We, however, hold that sentencing counsel performed ineffectively and remand for resentencing.

FACTS

The State of Washington accused James Bernhard of raping his wife, Ashley Bernhard, during the night of April 10-11, 2016 at the couple's residence. Bernhard

vociferously denies the charge. At trial, his wife also stridently disputed the charge. James and Ashley Bernhard married one another in 2003. We generally refer to Ashley Bernhard, the alleged victim, as Ashley and James Bernhard as Bernhard.

Ashley Bernhard's diabetes occupies a major role in this prosecution. At the age of nineteen, Ashley was diagnosed with Type I diabetes, a condition treated by maintaining normal blood sugar levels. Insulin, produced by the pancreas, lowers levels of glucose in the blood. The hormone promotes the absorption of glucose from the blood into liver, fat and skeletal muscle cells. When the pancreas fails to produce the needed insulin, the sufferer must inject synthetic insulin into her body. Ashley requires regular doses of fabricated insulin.

Ashley Bernhard sometimes suffers seizures when she became hypoglycemic. Hypoglycemia occurs when blood sugar levels dip below normal. The seizures result in injuries, such as bruises, rug burns, or a concussion. Since 2005, Ashley has been hospitalized for diabetes-related issues ten times per year.

Other medical ailments suffered by Ashley Bernhard also influence the contentions of the parties. Ashley also suffers from endometriosis, a disorder whereby uterine tissue grows outside of the uterus and causes menstrual irregularities. Ashley accumulates uterine fibroids, a condition that causes heavy menstrual bleeding. Ashley bleeds "uncontrollably" during her menstrual cycles.

After marriage, Ashley Bernhard began abusing alcohol. Alcohol intake decreases blood sugar levels. According to James Bernhard, Ashely drank approximately one-half gallon of vodka per day. In 2014, Ashley was diagnosed with cirrhosis of the liver, or chronic liver damage.

The alleged rape by James Bernhard of his wife occurred on the night of April 10 and 11, 2016. On April 10, James and Ashley Bernhard attended a barbecue hosted by Bernhard's work supervisor, Jill Thomson. The Bernhards arrived at 5:30 p.m. and left at 9:00 p.m. At the barbecue, Ashley consumed ten alcoholic beverages. Throughout the entire day, Ashley had approximately twenty alcohol drinks.

When James and Ashley Bernhard returned home from the barbecue, Ashley continued drinking. Eventually, Ashley retired to bed while Bernhard watched television in the living room. The State and James Bernhard dispute the events that transpired between the time when Ashley retired and 3:31 a.m. on April 11.

At 3:31 a.m. on April 11, 2016, James Bernhard called 911 requesting medical assistance for his wife. Bernhard told the 911 operator that he had checked Ashley's blood sugar level two hours earlier and that, when adjusting her blood sugar, they may have "overdone it." Exhibit (EX) 10 at 1. Bernhard told the operator that the previous test indicated a blood sugar level of 200 mg/dL, milligrams per deciliter. Ex. 10 at 1. One should aim for 70 to 130 mg/dL when fasting and less than 180 mg/dL after meals.

James Bernhard told the 911 operator that Ashley Bernhard's breathing was abnormal. He also stated that Ashley bled from her nose and mouth. The nosebleed concerned Bernhard, because Ashley's nose did not ordinarily bleed during a seizure.

When paramedics arrived at the Bernhard home, they discovered Ashley Bernhard naked and unconscious in the master bathroom. The shower measured thirteen feet by six feet, enclosed by granite on two sides and glass on the other two sides. Ashley's head lay on the shower drain, and she was wet from her thighs up. Paramedic Jason McGary noted no water on her feet. McGary observed blood diluted with water in the shower. McGary noted swelling on both sides of Ashley's face.

James Bernhard informed paramedics that his wife was on her menstrual cycle and would want to be covered with a robe, as she was modest. Shelley Ransier, a neighbor and friend of the Bernhards, testified at trial that Ashley was not modest.

During trial, Paramedic Jack Piper averred that James Bernhard's description of events continuously changed when answering questions from emergency responders during the early morning of April 11. Piper first asked Bernhard where he found Ashley. Bernhard answered that her abnormal breathing awoke him, after which time he dragged her from the bed to the shower and called 911. When Piper asked about Ashley's blood sugar level, Bernhard denied checking it. Piper then inquired how James knew her blood sugar was low if he had not checked it, to which Bernhard responded that he gave her an

4

extra eight units of insulin. Initially, Bernhard told Piper that he gave Ashley the insulin, but later corrected himself, stating that Ashley gave it to herself.

While attending to Ashley Bernhard at her home during early morning April 11, paramedics, using a glucometer, measured Ashley's blood sugar level to be low. A glucometer reads "low," as opposed to reading a specific level, if an individual's blood sugar level falls below 20 mg/dL, but experts deem a level below 80 mg/dL as low. Paramedics administered an intravenous glucose drip of Dextrose 50 (D50) and saline to raise Ashley's blood sugar. Ashley then began to revive.

EMT Josue Gonzalez entered the home's master bedroom and observed blood on the left side of the bed in the location where a person's midsection would lay. According to neighbor Shelley Ransier, Ashley typically slept on the left side of the bed. Paramedics observed no evidence that Ashley suffered a seizure. Her condition also contrasted with having suffered a diabetic seizure.

Between 4:02 and 4:14 a.m., paramedics transported Ashley Bernhard to Kadlec Medical Center in Richland. During the transport, emergency personnel continued to administer D50. After Ashley's arrival at the hospital, emergency room technicians gauged her blood glucose level at 40 mg/dL, which confirmed ongoing severe hypoglycemia. Ashley's blood alcohol content (BAC) measured 0.22.

At the emergency room, Debbierey Bongar, M.D. examined and evaluated Ashley Bernhard. Dr. Bongar detected bruising on both eyes, facial swelling, a bruise on her

right ear, and pain in her lower left rib on palpation. Ashley had lost a copious amount of blood and thus was anemic. During her time in the emergency room, Ashley required four blood transfusions.

During trial, Dr. Debbierey Bongar testified that one of the most common injuries occurring during a seizure is tongue lacerations. Ashley's tongue sustained no injury. Dr. Bongar testified that a seizure victim might bruise both sides of her face while seizing, but she had never before seen a seizure sufferer sustain two black eyes. Bongar also stated that she had not previously seen vaginal lacerations result from a diabetic seizure.

Kadlec Medical Center attending nurse Sheena Downey testified that Ashley Bernhard's injuries were inconsistent with someone who had a seizure. Downey elucidated that she had seen more than two dozen seizures in her career, and none had resulted in the trauma suffered by Ashley.

Nurse Whitney Dack spoke with James Bernhard at Kadlec Medical Center. At trial, Dack averred that Bernhard constantly changed his account of what happened to Ashley:

> He first said he never gave her any insulin. Then he said he did. Then his increments changed.

Report of Proceedings (RP) at 681.

Mark Mulholland, M.D., also examined Ashley Bernhard at Kadlec Medical Center. Dr. Mulholland observed four tears in and near Ashley's vagina. One laceration extended from the vaginal opening to the anus. Another laceration, located on the right labia minora, was superficial. Both of these external tears required stitches. Dr. Mulholland also found two internal vaginal lacerations. The smaller tear measured three centimeters. The larger tear measured ten to twelve centimeters and stretched from the inside of the vagina to the cervix. Dr. Mulholland surgically repaired the larger internal tear in the operating room. Mulholland attributed Ashley's initial blood loss to lacerations in her vaginal area.

During trial, Dr. Mark Mulholland testified that he had never seen traumatic vaginal injuries resulting from a diabetic seizure. Dr. Mulholland conceded that the external vaginal tears could have resulted from a fall. He further opined, however, that Ashley's internal vaginal lacerations could not have been caused by a fall. Mulholland explained that, for an object to cause injury far into the vaginal canal, the object needed to be placed purposefully into the vagina. He declared that, if a woman sustained lacerations both outside and inside the vagina from one fall, the laceration externally would be continuous with the laceration going into the vagina. Ashley did not sustain any external laceration continuous with an internal injury.

We return to the chronological narrative of events. On April 11, 2016 after Ashley Bernhard's surgery, Ashley's sister, Shelby Cooper, and mutual friend, Melissa Moore,

visited her at the hospital. Cooper asked Dr. Mark Mulholland whether Ashley's injuries were consistent with a fall. Dr. Mulholland did not respond due to patient privacy.

At 11:23 a.m. on April 11, 2016, Shelby Cooper sent James Bernhard a text message that claimed she intended to return to her home. Instead, Cooper and Melissa Moore visited the Bernhard residence. According to Cooper, Ashley asked her to retrieve clothes. Cooper and Moore accessed the house through an unlocked, side garage door. The duo entered the Bernhards' bedroom and noticed what they believed to be blood on the bed, a pillow, a small yellow rag on the floor near the bed, a spot on the carpet near the rag, and on a long maxi dress. The bed lacked sheets and a set of sheets rested in the washing machine. Cooper photographed the supposedly bloody areas and objects.

On April 12, 2016, Shelby Cooper asked Kadlec nurse Whitney Dack to contact law enforcement. Dack obliged. At 8:55 p.m. that evening, medical staff administered Oxycodone to Ashley Bernhard.

At 9:15 p.m. on April 12, Pasco Police Department Officer Jed Abastillas interviewed Ashley Bernhard at Kadlec Medical Center. Officer Abastillas testified both that Ashley was forthcoming but that "things weren't coming clearly to her at the time." RP at 747-48. Ashley completed and signed a domestic violence victim statement. The statement read:

> I recall James coming in the bedroom to check my blood sugar. Told me it was 274, I believe. I then went back to going to sleep and he comes in to give me insulin. This is not a normal occurrence for him to

8

administer insulin. I asked him how much he gave me, and I believe he said eight or 12 units. I told him that was way too much and I needed cereal. He brought in Rice Krispies, which I said would not help. I asked for pineapple.

I do not recall getting that, and the next thing I recall was waking up in the shower with about five to seven EMTs and firefighters, with blood all over. I was told by James I had a seizure and got in the shower and he said he didn't notice for awhile [sic].

I was still pretty out of it.

I was transported by ambulance to Kadlec. I had lost, I believe, six units of blood from the vaginal area due to trauma—to the trauma in the area.

RP at 1667-68.

The State, in an attempt to impeach Ashley Bernhard's testimony, played nine audio clips from an interview of Ashley by Pasco Detective Tony Aceves. On the recordings, Ashley told Detective Aceves: (1) on rare occasions, she and James Bernhard argued about sex, (2) Bernhard injected her with excessive insulin, without permission, on April 10, 2016, (3) Bernhard had previously administered her insulin only once, and (4) Ashley felt afraid of Bernhard "at this point." Ex. 170.

During trial, Ashley Bernhard testified that she did not recall her conversations with law enforcement at the hospital since she was on pain medication. Since she lacked access to alcohol in the hospital, Ashley took advantage of every medication she could. Bernhard denied telling Detective Tony Aceves that she awoke to James Bernhard injecting her with insulin without her permission.

9

On the stand, after reviewing her signed statement provided to law enforcement, Ashley Bernhard stated that she had asked James Bernhard to administer her insulin. She testified that she may have told detectives that her husband gave her too much insulin "so he could take advantage of me and then took it too far." RP at 1374. Ashley clarified that, if she had said that at the hospital, her comment resulted from being surrounded "by bystanders that are not his [Bernhard's] fan." RP at 1374.

During trial, Ashley Bernhard blamed her injuries on a diabetic seizure. On direct examination, Ashley Bernhard stated that she had sustained facial bruising during a seizure in the past. Ashley described an incident in a grocery store, when a seizure resulted in a concussion and bruising on one side of her face, two black eyes, and bruising to her ear. She testified that she did not visit the hospital on that occasion. Ashley averred that, contrary to Dr. Debbierey Bongar's testimony, she had bitten her tongue during her seizure on April 11, 2016.

During trial, Ashley Bernhard averred that she suffered random bleeding due to endometriosis and fibroids. She explained that, over the course of the eleven years she and James Bernhard owned their mattress, she often bled on the bed and the blood soaked into the mattress. She cleaned the mattress directly with laundry detergent. She cleaned the bed sheets with laundry detergent in a washing machine. Ashley averred that she sometimes showered in the middle of the night because of the bleeding. Blood droplets could have fallen on the carpet on her way to the shower.

The State highlighted that some of Ashley Bernhard's trial testimony contradicted statements uttered during a deposition. During her deposition, Ashley testified that she did not receive any black eyes during her grocery store seizure episode. Also, during her deposition, Ashley stated that she actually had gone to the hospital following her seizure in the grocery store.

After interviewing Ashley Bernhard on April 12, Officer Jed Abastillas, accompanied by Officer Thomas Groom, visited the Bernhard residence. The officers arrived after 11:00 p.m. on April 12. James Bernhard escorted them to the master bathroom. Inside the corner of the shower stood a plastic, four-legged stool. According to Bernhard, the stool was either on its side or upside down when he found Ashley in the shower, with products normally kept on top of the stool strewn throughout the shower.

During her trial testimony, neighbor Shelley Ransier averred that, on April 13, 2016, she peered inside the Bernards' garbage can. Ransier saw two white garbage bags "full of like clothing or something fluffy." RP at 598.

On April 14, 2016, Pasco Detectives Tony Aceves and Jesus Romero interviewed James Bernhard for three hours. The detectives recorded the entirety of the interview, which was admitted as Exhibit 143. During the interview, Bernhard narrated an account of the events that took place the night of April 10, 2016 and the morning of April 11, 2016. We do not particularize his entire statement. Nevertheless, portions of his story during the interview conflicted with comments he earlier told paramedics. When the

11

detectives confronted Bernhard with the notion that physical evidence conflicted with his narrative, Bernhard modified his story further. Bernhard insisted that any blood present in the master bedroom and bathroom came from Ashley's menstrual cycle.

During the law enforcement interview, the detectives mentioned that Shelby Cooper saw blood on the mattress in the master bedroom. James Bernhard responded that he had not seen any blood on the bed or on the bed sheets, which sheets he had recently laundered. Bernhard denied throwing any bed sheets away and expressed his belief that Cooper wished to harm him.

Detective Tony Aceves showed James Bernhard the photos Shelby Cooper took of the bloody objects in the Bernhard residence. Aceves asked why Ashley Bernhard bled so much. Bernhard replied that, contrary to the detectives' assertion, he had not reported that Ashley fell, but rather he lacked knowledge of events occurring in the bathroom. Bernhard suggested that Ashley returned to bed after injuring herself, which would explain blood on the bed. The detectives retorted that Ashley's doctors denied that she could have walked to the shower with the insulin level recorded at 2:00 a.m. Bernhard remonstrated that he observed Ashley being conscious and talking at even lower levels.

Two hours into the interview, James Bernhard admitted that he witnessed blood on the bed mattress, but not an amount explained by a nosebleed. Bernhard also told detectives that he removed some of the blood on the mattress, while not realizing the stain was fresh. Detective Tony Aceves queried Bernhard as to why he did not earlier

apprise officers of the blood on the bed. Bernhard replied that he had not inspected the bed when Ashley experienced her seizure, and, when he later discovered the stain, he worried that a late disclosure would appear suspicious.

At trial, James Bernhard delivered another narrative of the events on April 10 and 11, 2016. We do not repeat this testimony.

During trial, James Bernhard testified that he and Ashley's sister, Shelby Cooper, maintained a strained relationship since high school. He accused Cooper of trespassing into his home and manipulating the crime scene.

According to James Bernhard, he returned home to shower after being at Kadlec Medical Center on April 11, 2016. Bernhard performed some home chores. He removed sheets from the master bed, but, at trial, he could not remember whether he washed them or threw the bed sheets into the laundry chute. When he removed the sheets, he noticed staining on the mattress. Bernhard used a cleaning cloth to rub the stain on the bed before making the bed and going to sleep.

When asked, on direct examination, about his interview with detectives, James Bernhard admitted to answering questions untruthfully after realizing that they suspected him of harming Ashley. He declared that he did not wish to help the detectives, because they unfairly believed that he harmed his wife.

On April 15, 2016, staff discharged Ashley Bernhard from Kadlec Medical Center. On the same day, law enforcement executed a search warrant at the Bernhard residence.

Law enforcement located no bloody dress or bloody yellow rag, previously photographed by Shelby Cooper, in the house.

During the execution of the search warrant, Pasco Police Department technician Ashley Lucas sprayed objects within the Bernhard's house with "BLUESTAR," a chemical agent based on luminol that reacts with hemoglobin in blood, some metals, and some cleaning solutions. BLUESTAR reacts with small traces of blood that may not be visible to the naked eye, producing a bright blue chemiluminescence that can be photographed. *State v. Little Long*, 962 N.W.2d 237, 243 (S.D. 2021). The resulting reaction remains visible only for seconds in a dark room. Use of BLUESTAR and other versions of luminol is a presumptive test for blood, not a determinative one.

Some of the objects sprayed by Ashley Lucas with BLUESTAR illuminated. Lucas noted luminol reactions in the master bedroom on the left side and foot of the bed. The spraying resulted in a luminol reaction consisting of "two pretty distinctive lines on the carpet" leading onto the linoleum in the master bathroom. RP at 972. Lucas estimated each line to extend eight to ten feet long and three or four inches wide. Lucas sprayed the shower floor and back wall and noticed a luminol reaction in the form of a droplet two feet up the wall.

Ashley Lucas unsuccessfully attempted to photograph the luminol reactions. She could not adjust the camera's settings to capture the reaction. Lucas decided to collect the objects that reacted positively to the spray to test them a second time at police

department headquarters. Lucas collected cutouts from the carpet, bathroom linoleum, and a shower step for further testing. Officers also seized a gray sheet, a tan sheet, and the shower table for purposes of testing.

On April 18, 2016, Ashley Lucas and Detective Corey Smith sprayed BLUESTAR on the objects seized from the Bernhard residence. Presumably, the testing occurred at the Pasco Police Department headquarters. The spraying caused illumination on the gray sheet, bathroom shower step, carpet, mattress pad, and shower table leg. Lucas swabbed each of the illuminated areas and sent the swabs to the Washington State crime laboratory to test for DNA. Lucas unsuccessfully attempted to recreate the luminol reaction on a large section of the carpet, but the cutout had been diluted by that time. At trial, Lucas explained that luminol can dilute the surface of the tested object if used more than twice.

Crime laboratory Forensic Scientist Beau Baggenstoss tested the swabs sent to the laboratory by Pasco Police Department Technician Ashley Lucas. To test the swabs, Baggenstoss applied phenolphthalein, a chemical that, like BLUESTAR, presumptively indicates the presence of blood. Phenolphthalein is more specific than BLUESTAR. The phenolphthalein testing found no blood on the carpet, mattress, or shower table. The phenolphthalein confirmed blood present on the gray sheet and the bathroom shower step.

According to Beau Baggenstoss, a negative phenolphthalein test does not conclusively rule out the presence of blood. Further testing revealed Ashley Bernhard's

15

DNA on the gray sheet and the shower step. Baggenstoss also found DNA from another individual on the step, but the poor quality of the DNA prevented identification of the contributor.

PROCEDURE

On April 18, 2016, the State of Washington charged James Bernhard with rape and assault of his wife, Ashley. By trial, the State had charged James Bernhard, by fifth amended information, with second degree rape, first degree assault, and second degree assault. The State alleged that each crime constituted domestic violence.

On April 16, 2019, the State filed a motion to admit testimony relating to BLUESTAR testing. In the motion, the State acknowledged that nearly all the items tested with luminol produced a negative result when later tested with phenolphthalein. It also recognized that BLUESTAR is only a presumptive test. The State maintained, nonetheless, that admission of the evidence would present the jury with a full and complete picture of the forensic evidence collected and tested by law enforcement. The presumptive nature of the BLUESTAR testing went to the weight, not the admissibility, of the evidence, according to the State.

The trial court conducted an evidentiary hearing on the State's request to admit BLUESTAR evidence. Pasco evidence technician Ashley Lucas and Washington State Crime Laboratory forensic scientist Beau Baggenstoss testified at the hearing. Both Lucas and Baggenstoss testified that luminol, such as BLUESTAR, is a presumptive test

16

for blood. According to Baggenstoss, law enforcement ordinarily sprays luminol to identify an area that should be tested with phenolphthalein, which latter chemical results in a second presumptive result. According to Baggenstoss, phenolphthalein confirmed the presence of blood on the gray bed sheet.

During the motion hearing, the State argued that James Bernhard could cross-examine Ashley Lucas and Beau Baggenstoss on the subject that BLUESTAR is not conclusive. The State theorized that Bernhard cleaned Ashley's blood from the tested areas. As such, it argued that the luminol tests were relevant, even though most of the tested objects did not have DNA on them. Bernhard rejoined that the luminol evidence was minimally valuable, because cleaning products are routinely used to clean carpets and bathroom floors.

The trial court ruled testimony of the BLUESTAR testing admissible provided the State's witnesses inform the jury of the presumptive nature of testing. The superior court deemed *State v. Stenson*, 132 Wn.2d 668, 940 P.2d 1239 (1997) controlling.

At trial, Ashley Bernhard expressed her anger at the State for charging James Bernhard with crimes he did not commit. Ashley mentioned that, before trial, she threatened to sue the Franklin County Prosecutor's Office for millions of dollars if the office refused to drop the prosecution of James.

At trial, Ashley Lucas and Beau Baggenstoss testified consistently with their motion hearing testimony. Lucas explained that BLUESTAR is a presumptive test, as it

reacts with household cleaning products. Lucas testified to her observations of the BLUESTAR reactions, including the two lines that stretched from the carpet near the master bed into the master bathroom. Lucas described the lines as "distinctive" and "drag marks." RP at 972, 979. When examining Ashley Lucas, the State admitted photographs depicting BLUESTAR reactions on items sprayed at the police station.

During his testimony, Beau Baggenstoss explained that phenolphthalein testing is presumptive of blood, but more specific than luminol testing, and used to corroborate a BLLUESTAR reaction. Baggenstoss informed the jury that phenolphthalein testing confirmed blood on the gray bed sheet and shower step, but not on any other objects that initially reacted to luminol.

During trial, the State argued to the jury that James Bernhard felt frustrated with his and Ashley Bernhard's sex life, their financial problems, her alcoholism, and her medical issues. According to the State, Bernhard purposely injected his wife with excessive insulin to induce unconsciousness before raping her.

In its closing argument, the State forwarded three alternatives for how James Bernhard committed second degree assault. It argued that Bernhard committed the crime by poisoning Ashley Bernhard with a dangerous dose of insulin, penetrated her vagina with a fist or object causing lacerations, or assaulted her with the intent to commit second degree rape. The trial court instructed the jury that, to convict Bernhard of assault in the second degree, it needed to find beyond a reasonable doubt that he:

18

(a) intentionally assaulted [Ashley Bernhard] and thereby recklessly inflicted substantial bodily harm on [Ashley]; or

(b) administered or caused to be taken by [Ashley] a poison or a destructive noxious substance with intent to inflict bodily harm on [Ashley]; or

(c) assaulted [Ashley] with intent to commit Rape in the Second Degree[.]

Clerk's Papers (CP) at 160.

The jury could not reach a unanimous verdict on the first degree assault charge. Accordingly, the trial court declared a mistrial on that count.

The jury found James Bernhard guilty of second degree rape and second degree assault. In a special verdict form, the jury determined that James intentionally committed second degree assault by recklessly inflicting substantial bodily harm and assaulted her with the intent to inflict bodily harm. The jury unanimously rejected that Bernhard assaulted Ashley by poisoning her with a "destructive or noxious substance." CP at 189. The jury further found that Bernhard committed each crime against a member of his family or household.

The trial court calculated James Bernhard's offender score at 5 for the charge of second degree rape and 3 for the charge of second degree assault. The trial court sentenced James to 126 months' confinement on the rape charge and 15 months' confinement on the assault charge. The trial court ordered that these sentences run concurrently. The trial court also imposed a 24-month sexual motivation enhancement for the assault conviction to run consecutively with James' 126-month sentence, for a

total term of 150 months' confinement. At sentencing, defense counsel did not argue that

James Bernhard's convictions for second degree rape and second degree assault

constituted the same criminal conduct.

## LAW AND ANALYSIS

On appeal, James Bernhard challenges the superior court's admission of evidence

of BLUESTAR's lumination of objects found in his home. He asks that we reverse both

of his convictions and remand for a new trial without such evidence. Bernhard also

complains of his counsel's failure to argue that his convictions constituted the same

criminal conduct for purposes of sentencing.

### BLUESTAR Evidence

James Bernhard labels the State's BLUESTAR evidence as speculative,

inflammatory, and prejudicial. He assigns error to the admission of the evidence because

the evidence did not assist the jury as required for expert testimony under ER 702 and the

superior court failed to perform a balancing of prejudice and probity under ER 403. We

only address the challenge of the evidence under ER 702 because Bernhard did not ask

the superior court to bar the evidence under ER 403 at trial. We generally do not address

assignments of error not raised before the superior court. RAP 2.5(a).

The admissibility of expert testimony lies within the discretion of the trial court.

*State v. Stenson*, 132 Wn.2d 668, 715 (1997). Unless the superior court abuses its

discretion, we will not disturb the court's evidentiary ruling. *State v. Ortiz*, 119 Wn.2d

20

294, 308 831 P.2d 1060 (1992) (plurality opinion). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds. *State v. Hamilton*, 196 Wn. App. 461, 476 n.8, 383 P.3d 1062 (2016).

ER 702 declares:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

James Bernhard does not dispute the qualifications of technician Ashley Lucas and scientist Beau Baggenstoss to introduce evidence of BLUESTAR testing. We focus on whether the scientific evidence could have assisted the jury to understand the evidence or to determine the guilt or innocence of Bernhard.

If we decided this appeal on a vacant whiteboard, we might agree with James Bernhard. Testing results should not be admissible unless an expert testifies that more likely than not the result proves the presence of a substance. A possibility does not suffice for admissibility. Nevertheless, the Washington Supreme Court, in *State v. Stenson*, 132 Wn.2d 668 (1997), previously addressed the admissibility of presumptive blood tests. We observe important differences between the blood testing performed during the investigation of Bernhard's conduct and the testing performed in *State v. Stenson*. Nevertheless, the Supreme Court's decision broadly endorsed introduction of presumptive blood testing results as long as scientists employ the testing and as long as

the State informs the jury of the presumptive, not conclusory, nature of the testing.  In

short, as noted by the trial court, *State v. Stenson* controls the admissibility of the

BLUESTAR evidence.

In *State v. Stenson*, the State charged Darold Stenson with the first degree murders

of his wife and his business partner.  The pants Stenson wore at the time of the murders

exhibited stains.  Forensic scientist Michael Grubb of the Washington State Patrol Crime

Laboratory visually identified the stains on Stenson's pants as blood.  On testing with

phenolphthalein, the stains reacted positively.  During his trial testimony, Grubb

explained:

> the luminol test does require some other confirmatory test to reach
> the conclusion that it is blood, *but in the phenol [phenolphthalein] test, if
> accompanied by a visual observation of blood, the appearance of blood is
> considered specific by many, including himself.*

*State v. Stenson*, 132 Wn.2d at 717 (emphasis added).  Defense counsel asked Grubb

whether a positive phenolphthalein test in conjunction with a positive visual inspection

was accepted as conclusive evidence of blood.  Grubb responded in the negative.

On appeal, Darold Stenson argued that the trial court erred by admitting the

presumptive phenolphthalein testing result.  Stenson contended that the evidence was

inadmissible under ER 702, because it was not helpful to a trier of fact based on its

presumptive nature.  The Washington Supreme Court rejected Stenson's challenge.  The

court held that the trial court did not abuse its discretion by admitting the phenolphthalein

22

evidence. The court reasoned that the results of the phenolphthalein testing were supported by Michael Grubb's testimony that the stains looked like blood.

The Washington Supreme Court, in *State v. Stenson*, underscored that multiple jurisdictions, including Washington, recognize presumptive tests for blood as acceptable. The Court wrote:

> Lack of certainty in scientific tests (that are generally accepted by the scientific community) goes to the weight to be given the testimony, not its admissibility. . . . So long as a jury is clearly told that the phenol test is only a presumptive test and may indicate a substance other than human blood, it is admissible under ER 702.

*State v. Stenson*, 132 Wn.2d at 718.

James Bernhard astutely forwards three distinctions between *State v. Stenson* and his appeal. First, the forensic scientist in *Stenson*, Michael Grubb, testified that a positive phenolphthalein reaction sufficiently corroborated a visual inspection for blood in his and other experts' opinions. By contrast, no expert witness in Bernhard's prosecution visually confirmed the presence of blood on any object. We agree with this difference in the evidence. Nevertheless, the Supreme Court never emphasized the confirmation of the presence of blood by later phenolphthalein testing. To the contrary, the Court relied heavily on foreign decisions that entail only the use of luminol testing.

Further, the Supreme Court, in *State v. Stenson*, held that the presumptive nature of blood testing goes to the weight, not admissibility, of expert testimony on the subject.

23

Grubb's opinion that he conclusively found blood on Darold Stenson's pants merely served to bolster his credibility.

Second, James Bernhard highlights that Michael Grubb differentiated luminol testing from phenolphthalein testing. According to Grubb, the former required confirmatory evidence, while the latter did not, if corroborated by a positive visual detection of blood. In James Bernhard's prosecution, not only did the State admit luminol testing evidence, but nearly all of the luminol tests were uncorroborated by subsequent phenolphthalein testing. Again, we agree with Bernhard's accurate description of the difference between the testing in his prosecution from the testing in *State v. Stenson.* We answer, however, that the Supreme Court never ruled confirmation by phenolphthalein to be a requirement for admissibility of luminol testing. A negative phenolphthalein assessment does not necessarily mean the absence of blood. Again, the Supreme Court relied on foreign decisions entailing luminol testing.

We agree that luminol is less accurate in detecting blood than phenolphthalein, but this fact goes to the weight of an expert's testimony discussing the luminol testing, rather than the admissibility of the testimony. Ultimately, both tests are presumptive.

Third, Michael Grubb, the expert in *Stenson*, testified that the substance at issue was blood. In James Bernhard's prosecution, no witness testified that he or she actually discovered blood. We provide the same answer that we supplied in response to Bernhard's first distinction.

24

James Bernhard's prosecution includes several unique factors that bolster the admission of the BLUESTAR results. Blood spots illuminated by BLUESTAR confirmed the presence of Ashley Bernhard's DNA. Later phenolphthalein testing showed the presence of blood on the gray sheet and the shower step. The luminosity also held relevance because of the potential use by Bernhard of compounds to wipe clean the purported crime scene. Luminol reacts to certain bleaches. *People v. Cumbee*, 366 Ill. App. 3d 476, 851 N.E.2d 934, 946, 303 Ill. Dec. 747 (2006).

BLUESTAR works as an advance species of luminol. Although we find reported decisions that include facts depicting the use of BLUESTAR, none of these decisions addressed the admissibility of BLUESTAR. The defendant did not challenge the admissibility of the testing on appeal. *Pugh v. State*, 639 S.W.3d 72, 79 (Tex. Crim. App. 2022); *State v. Little Long*, 962 N.W.2d 237, 243 (S.D. 2021); *State v. Ceplecha*, 2020 S.D. 11, 940 N.W.2d 682, 689; *Vinson v. State*, 2020 WY 93, 467 P.3d 1009, 1015.

James Bernhard cites four decisions that hold results of luminol testing inadmissible. *United States v. Hill*, 41 M.J. 596 (U.S. Army Ct. Crim. App. 1994); *Brenk v. State*, 311 Ark. 579, 847 S.W.2d 1 (1993); *State v. Moody*, 214 Conn. 616, 573 A.2d 716 (1990); *State v. Fukusaku*, 85 Haw. 462, 946 P.2d 32 (1997). Nevertheless, the majority of states permit introduction of the results of luminol testing despite the recognition that luminol reacts to substances other than human blood such as animal blood and certain metals. *Lobato v. State*, 125 Nev. 1057, 281 P.3d 1196 (2009); *Dunn v.*

*State*, 371 Ark. 140, 264 S.W.3d 504, 510-11 (2007); *People v. Cumbee*, 366 Ill. App. 3d 476, 851 N.E.2d 934, 946-50, 303 Ill. Dec. 747 (2006); *Mackerley v. State*, 900 So. 2d 662, 663-64 (Fla. Dist. Ct. App. 2005); *Dodd v. State*, 2004 OK CR 31, 100 P.3d 1017, 1037; *Commonwealth v. Duguay*, 430 Mass. 397, 720 N.E.2d 458, 462 (1999); *State v. Canaan*, 265 Kan. 835, 964 P.2d 681 (1998); *State v. Moseley*, 336 N.C. 710, 445 S.E.2d 906, 912 (1994); *Robedeaux v. State*, 866 P.2d 417, 425 (Okla. Crim. App. 1993); *Johnston v. State*, 497 So. 2d 863 (Fla. 1986); *Graham v. State*, 374 So. 2d 929 (Ala. Crim. App. 1979). The limits to luminol testing impact the weight, not admissibility, of the evidence. Luminol testing is reliable and generally accepted in the scientific community such that no Frye hearing is needed. *People v. Cumbee*, 851 N.E.2d 934, 947 (Ill. App. Ct. 2006); *State v. Canaan*, 265 Kan. 835 (1998); *Michael v. State*, 437 So. 2d 138, 140 (Fla. 1983); *People v. Garries*, 645 P.2d 1306, 1308 (Colo. 1982).

In three decisions, *Lobato v. State*, *People v. Cumbee*, and *Commonwealth v. Duguay*, a later confirmatory test failed to confirm the presence of blood. The respective reviewing courts still affirmed the admission of the luminol testing result.

In *State v. Stenson*, Darold Stenson relied on an Arkansas decision, *Brenk v. State*, 847 S.W.2d 1 (1993), that held admission of the results of luminol testing in the absence of follow-up testing to confirm the substance causing the reaction was human blood constituted reversible error. James Bernhard also relies on this Arkansas decision. In *Dunn v. State*, 371 Ark. 140, 264 S.W.3d 504, 510–11 (2007) the Arkansas Supreme

Court distinguished *Brenk* on the basis that no later testimony confirmed the luminol testing in *Brenk*. The court affirmed admission of the luminol results. In James Bernhard's appeal, the phenolphthalein testing confirmed blood's presence on a sheet and a shower step.

In one decision of the decisions cited by James Bernhard, the reviewing court held that the trial court did not abuse its discretion when excluding expert testimony on luminol and phenolphthalein test results because of the inconclusive nature of the results. *State v. Fukusaku*, 85 Haw. 462, 946 P.2d 32, 66-67 (1997). Nevertheless, the high court did not address whether the trial court would have abused its discretion if it admitted the evidence.

In James Bernhard's appeal, Ashley Lucas and Beau Baggenstoss explained to the jury that BLUESTAR reactions do not confirm, but instead indicate, the possible presence of blood. Under *State v. Stenson*, this testimony suffices for introduction of the evidence. The superior court did not abuse its discretion when admitting the BLUESTAR evidence under ER 702.

James Bernhard questions Ashley Lucas' description of the lines of BLUESTAR reaction coming from the foot of the bed into the master bathroom as "drag marks." RP at 979. Nevertheless, James did not object, during trial, to this portion of Lucas' testimony. Accordingly, we decline to address James' assigned error for not first raising this issue with the trial court. RAP 2.5(a).

27

Ineffective Assistance of Counsel

James Bernhard asserts that defense counsel provided ineffective assistance by not arguing that his convictions for second degree rape and second degree assault were the same criminal conduct for purposes of his offender score. As such, he requests that this court remand for resentencing with a lower score. The State responds that defense counsel did not err, because she had no basis to make a same criminal conduct argument. We agree with Bernhard.

To prevail on an ineffective assistance of counsel claim, the defendant must demonstrate both (1) that defense counsel's representation was deficient, and (2) that the deficient representation prejudiced the defendant. *State v. Estes*, 193 Wn. App. 479, 488, 372 P.3d 163 (2016), *aff'd*, 188 Wn.2d 450, 395 P.3d 1045 (2017). Representation is deficient if, after considering all the circumstances, the performance falls below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Estes*, 193 Wn. App. 479, 488 (2016). Prejudice comes with a reasonable probability that, except for counsel's errors, the result of the proceeding would have differed. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

A same criminal conduct analysis may be necessary when a defendant is convicted of more than one current offense. When sentencing an offender for one or more felonies, the trial court must calculate the defendant's offender score, which score influences the

standard sentence range. The sentencing court computes an offender's score based on the number of current and prior convictions. RCW 9.94A.525, .589(1)(a); *State v. Aldana Graciano*, 176 Wn.2d 531, 535-36, 295 P.3d 219 (2013). If the court finds that some of the current offenses encompass the same criminal conduct, the sentencing court shall count those current offenses as one crime. RCW 9.94A.589(1)(a); *State v. Aldana Graciano*, 176 Wn.2d 531, 536 (2013).

RCW 9.94A.589, a critical section of the Sentencing Reform Act of 1981, chapter 9.94A RCW, reads, in pertinent part:

> (1)(a) . . . [W]henever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that *some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime*. . . . "Same criminal conduct," as used in this subsection, means two or more crimes that require the *same criminal intent, are committed at the same time and place, and involve the same victim*.

(Emphasis added.) James Bernhard committed the rape and assault at the same time and place against the same victim. We focus on the same criminal intent element of the test.

Offenses have the same criminal intent when, viewed objectively, the intent does not change from one offense to the next. *State v. Kloepper*, 179 Wn. App. 343, 357, 317 P.3d 1088 (2014). Intent, in this context, is not the particular mens rea element of the particular crime, but rather is the offender's objective criminal purpose in committing the crime. *State v. Kloepper*, 179 Wn. App. 343, 357 (2014). Courts have also looked at

whether one crime furthers the other or whether the offenses were part of a recognized plan or scheme. *State v. Kloepper*, 179 Wn. App. at 357.

In addressing James Bernhard's challenge to the effectiveness of his trial counsel's conduct, we must review the verdict of the jury. The rule of lenity requires this court to interpret an ambiguous verdict in favor of the criminal defendant when determining if one crime relates to another crime. *State v. Taylor*, 90 Wn. App. 312, 317, 950 P.2d 526 (1998). In *Taylor*, the jury concluded that Jonathan Taylor assaulted and kidnapped Rodney Murphy.

> [B]ut the verdict did not indicate which assaultive incident the jury was relying upon to find guilt—incident (a), Taylor's accomplice liability for [Michael] Nicholson's conduct in pointing the gun during the kidnapping, or incident (b), the shooting of the gun at the car.

*State v. Taylor*, 90 Wn. App. at 317.

On appeal, Jonathan Taylor argued that the assault and kidnapping convictions constituted the same criminal conduct for purposes of sentencing. This court agreed. For purposes of its analysis, based on the rule of lenity, this court assumed that Taylor's assault conviction arose from incident (a). This court relied, in part, on an Eighth Circuit case, in which the court held that, when imposing a sentence on an "ambiguous verdict susceptible of two interpretations," a trial court may not impose an alternative producing a higher sentencing range. *State v. Taylor*, 90 Wn. App. at 317 (citing *United States v. Baker*, 16 F.3d 854, 857-58 (8th Cir. 1994)). In *State v. Deryke*, 110 Wn. App. 815, 824

30

n.22, 41 P.3d 1225 (2002), *aff'd*, 149 Wn.2d 906, 73 P.3d 1000 (2003), this court again held that principles of lenity require an interpretation of an ambiguous verdict in favor of the criminal defendant for purposes of sentencing.

In its prosecution, the State of Washington raised three alternatives means by which James Bernhard committed second degree assault. A jury instruction listed these alternatives. The instruction directed the jury to convict Bernhard of assault in the second degree if it found, beyond a reasonable doubt that he:

> (a) intentionally assaulted [Ashley Bernhard] and thereby recklessly inflicted substantial bodily harm on [Ashley]; or
> (b) administered or caused to be taken by [Ashley] a poison or a destructive noxious substance with intent to inflict bodily harm on [Ashley]; or
> (c) assaulted [Ashley] with intent to commit Rape in the Second Degree.

CP at 160. In its verdict, the jury found the State proved alternatives (a) and (c) beyond a reasonable doubt and unanimously rejected alternative (b). For second degree rape, a jury instruction informed the jury that it must find that Bernhard engaged in sexual intercourse with Ashley when Ashley was incapable of consent by reason of being physically helpless.

James Bernhard argues that, consistent with *State v. Taylor* and *State v. Deryke*, this court must assume that his second degree rape and second degree assault convictions constituted the same criminal conduct. James reasons that alternatives (a) and (c) both required a finding that he committed the rape and assault at the same time with the same

31

act of penetration. The assault furthered, if not led directly to, the rape. In the alternative, the assault and rape involved the same intent and constituted the same act.

The State answers that James Bernhard's convictions for second degree rape and second degree assault did not constitute the same criminal conduct, because each crime required a separate intent. The State contends that *State v. Brown*, 100 Wn. App. 104, 995 P.2d 1278 (2000), *reversed in part on other grounds by* 147 Wn.2d 330, 58 P.3d 889 (2002) and *State v. Kloepper*, 179 Wn. App. 343 (2014) control.

In *State v. Brown*, a jury found Jacob Brown guilty of first degree rape and first degree assault against one victim. On appeal, this court concluded that Brown's two crimes were not the same criminal conduct, because rape and assault have separate intents.

In *State v. Kloepper*, a jury convicted Cody Kloepper of first degree rape, first degree burglary, and first degree assault. The trial court ruled that the rape and assault convictions arose from separate conduct. Kloepper appealed the trial court's ruling. This court noted that crimes that do not constitute the same criminal conduct are necessarily separate and distinct offenses.

On appeal, Cody Kloepper argued that his assault of the victim furthered the rape, because the assault ended when the victim submitted to the rape. This court acknowledged that the trial court could have viewed the evidence as Kloepper did, but it

did not.  Instead, based on the record, the court could view the rape as a crime of opportunity that presented itself after the assault rather than as the object of the attack.

The State argues that the record in James Bernhard's appeal only supports the conclusion that Bernhard's rape and assault of Ashley arose from separate criminal intents.  The State highlights that the jury found that Bernhard not only assaulted Ashley with the intent to commit second degree rape, but that he also intentionally assaulted her, thus recklessly inflicting substantial bodily harm.  The State argues that, unlike in *State v. Kloepper*, because Ashley was already unconscious, Bernhard did not need to assault her to further the crime of rape.  Instead, each crime had its own purpose.

James Bernhard assumes that vaginal penetration served as the basis for his second degree assault conviction.  The State apparently disagrees, without specifying what underlying act comprised the assault.  The jury found that Bernhard intentionally assaulted Ashley, recklessly causing her substantial bodily harm, and assaulted her with the intent to commit second degree rape.  The jury's verdict as to second degree assault is, therefore, ambiguous.  Pursuant to *State v. Taylor* and *State v. Deryke*, we apply the rule of lenity to the jury's verdict, thereby accepting the interpretation more favorable to Bernhard for the purposes of sentencing.  We conclude that Bernhard committed the assault under alternative (c), with the intent of committing rape.

As this court noted in *State v. Kloepper*, 179 Wn. App. 343, 357 (2014), when considering whether two offenses constitute the same criminal conduct, courts have

looked at whether one crime furthers the other or whether the offenses were part of a recognized plan or scheme. The State's theory at trial was that James Bernhard poisoned Ashley Bernhard with an excessive amount of insulin, which rendered her unconscious, so that he might rape her out of frustration for Ashley's lack of interest in sex, among other reasons. The jury's verdict supports that Bernhard assaulted his wife with the purpose of raping her. Unlike in *Kloepper*, the record does not support the conclusion that Bernhard's rape of Ashley was a crime of opportunity that arose after the assault.

Sentencing defense counsel erred by not arguing that James Bernhard's convictions for second degree assault and second degree rape constituted the same criminal conduct. This error prejudiced James, because the record supports that his crimes were neither separate nor distinct. The trial court likely would have accepted this argument and thus calculated a lower offender score, resulting in a lower sentence.

## Judgment and Sentence Error

James Bernhard maintains that the judgment and sentence incorrectly stated his sentence for second degree rape. The judgment and sentence lists the minimum term for the rape as "150 months." CP at 208. The sentencing court instead imposed an actual minimum term of 126 months' confinement, with the total term being 150 months confinement when adding the sexual motivation enhancement. The State answers that, on January 19, 2021, the sentencing court amended the judgment and sentence to resolve this scrivener's error.

34

James Bernhard's appellate counsel now acknowledges that the sentencing court corrected the mistake. Therefore, we do not address the assigned error.

CONCLUSION

We affirm James Bernhard's convictions for rape and assault. We remand for resentencing, during which process the court should exercise its discretion consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Pennell, J.

35